MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:     2013 ME 24
Docket:       Ken-11-454
Argued:       September 13, 2012
Decided:      March 5, 2013

Panel:        SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.
Majority:     SAUFLEY, C.J., and LEVY, MEAD, and GORMAN, JJ.
Dissent:      ALEXANDER, SILVER, and JABAR, JJ.

JOHN DOE I et al.

v.

ROBERT WILLIAMS et al.

MEAD, J.

[¶1]  John Does I, III, IV, V, VI, VII, VIII, X, XIII, XVI, XVIII, XXIV, and XLIII, joined by John Does XIX[1] and XXIII, appeal from a summary judgment entered in the Superior Court (Kennebec County, *Murphy, J.*) in favor of numerous State officials on the parties' cross-motions for summary judgment.  The Does challenge the constitutionality of Maine's Sex Offender Registration and Notification Act of 1999 (SORNA of 1999), 34-A M.R.S. §§ 11201-11256 (2012).  We affirm the trial court's judgment, concluding that SORNA of 1999 as amended

---

[1]  John Doe XIX was originally John Doe XVIII, but the trial court changed his pseudonym because it was already assigned to another John Doe.

2

following our decision in *State v. Letalien*, 2009 ME 130, 985 A.2d 4, does not violate the constitutional rights of the litigants before us.

## I. BACKGROUND[2]

[¶2]   John Doe I was previously before us in *Doe v. District Attorney*, 2007 ME 139, 932 A.2d 552.  John Doe I pleaded guilty to and was convicted of unlawful sexual contact with a family member, *id.* ¶ 2, and in 1985 was sentenced to five years' imprisonment with all but sixty days suspended and two years' probation.  He has not been convicted of any sex offenses since.

[¶3]   In 2005, the Legislature amended SORNA of 1999 to apply retroactively to all sex offenders sentenced on or after January 1, 1982.  P.L. 2005, ch. 423, § 1 (effective Sept. 17, 2005) (codified at 34-A M.R.S. § 11202(1) (2012)); *see Doe*, 2007 ME 139, ¶ 14, 932 A.2d 552.  John Doe I sued several State officials in their official capacities, arguing that the retroactive application of SORNA of 1999 violated his rights to procedural and substantive due process, equal protection, and a civil jury trial, pursuant to the Maine and United States Constitutions.  *Doe*, 2007 ME 139, ¶ 5, 932 A.2d 552.  Upon the State officials' motion to dismiss, the Superior Court (Kennebec County, *Studstrup, J.*) dismissed

---

[2]   *Doe v. District Attorney*, 2007 ME 139, ¶¶ 10-19, 932 A.2d 552, and *State v. Letalien*, 2009 ME 130, ¶¶ 4-12, 985 A.2d 4, provide a detailed history of sex offender laws in Maine.  The background we provide here focuses on the factual and procedural history of the litigants and the amendments to SORNA of 1999 after *Letalien*.

John Doe I's complaint for failure to state a claim upon which relief could be granted. *Id.* ¶ 1. John Doe I appealed, and we concluded that (1) further factual development was required to determine whether SORNA of 1999 was an unconstitutional ex post facto law[3] as applied to him,[4] and (2) he should not have been foreclosed from pursuing his other theories of relief. *Id.* ¶¶ 1, 36-37. We then remanded the case to the trial court for further proceedings on those issues. *Id.* ¶ 37. On remand, John Doe I's case was consolidated with cases brought by other convicted sex offenders who were also challenging the retroactive application of SORNA of 1999.

[¶4] In 2009, the Legislature created an exception from the duty to register for sex offenders meeting certain criteria who were sentenced on or after January 1, 1982, and before June 30, 1992. P.L. 2009, ch. 365, § B-3 (effective Sept. 12, 2009) (codified at 34-A M.R.S. § 11202-A(1) (2009)).[5] Sex offenders fall within the exception if, among other criteria, their underlying convictions did not include more than one Class A sex offense or sexually violent offense, they had

---

[3] Although John Doe I did not assert an ex post facto violation, the Superior Court treated his procedural due process claim as an ex post facto claim. *Doe*, 2007 ME 139, ¶¶ 1, 8, 932 A.2d 552.

[4] We later held in *Letalien* that "[f]or ex post facto purposes, SORNA of 1999 is properly evaluated on its face" rather than by examining its application to any given individual. 2009 ME 130, ¶ 34, 985 A.2d 4.

[5] Title 34-A M.R.S. § 11202-A (2009) was amended after *Letalien*, 2009 ME 130, 985 A.2d 4, and will be discussed in detail later in this opinion. *See* P.L. 2009, ch. 570 (effective Mar. 30, 2010) (codified at 34-A M.R.S. §§ 11202-A, 11222, 11225-A (2012)).

no prior sex offense convictions, and they had no subsequent convictions for crimes punishable by imprisonment of one year or more. 34-A M.R.S. § 11202-A(1)(A)-(F). Because of the newly enacted exception, many of the John Does became eligible for relief from the duty to register and withdrew from the litigation. Some Does who were eligible for relief, however, chose to continue with the litigation along with the Does who were ineligible for relief.

[¶5] We decided *Letalien* shortly after 34-A M.R.S. § 11202-A(1) became effective. Pursuant to the Sex Offender Registration Act of 1995, Letalien's sentence included a requirement that he register for fifteen years on the State's sex offender registry; the sentence provided that after five years Letalien could seek a waiver "upon a finding that [he] 'ha[d] shown a reasonable likelihood that registration is no longer necessary and waiver of the registration requirement is appropriate.'" *Letalien*, 2009 ME 130, ¶ 5, 985 A.2d 4 (quoting 34-A M.R.S.A § 11121(6)(C) (Supp. 1996)). While Letalien was on probation, the Legislature enacted SORNA of 1999, which required him to register for life, prevented him from seeking a waiver, and established additional reporting requirements. *Id.* ¶¶ 6-8 (citing P.L. 1999, ch. 437, § 2 (effective Sept. 18, 1999) (codified at 34-A M.R.S.A. §§ 11201-11252 (Pamph. 1999))). Letalien challenged SORNA of 1999 as unconstitutional under the Ex Post Facto Clauses of the United States and Maine Constitutions. *Id.* ¶ 1. We concluded that SORNA of 1999 "impose[d] an

ex post facto punishment as to offenders sentenced in the years before the effective date of [the statute] for whom registration was a required part of their sentence and who were subsequently made subject to the more burdensome requirements." *Id.*

[¶6] In response to the *Letalien* decision, the Legislature amended SORNA of 1999 by enacting P.L. 2009, ch. 570 (effective Mar. 30, 2010) (codified at 34-A M.R.S. §§ 11202-A, 11222, 11225-A (2012)). The amendments extended the exception from registration provided by P.L. 2009, ch. 365, § B-3, making it available to qualifying offenders sentenced through September 18, 1999, the effective date of SORNA of 1999.[6] *See* P.L. 2004, ch. 570, § 1. The amendments also changed the reporting requirements for offenders' registration information, such as residence and place of employment. P.L. 2004, ch. 570, § 4. Ten-year registrants are now subject to annual verification in writing and in-person verification once every five years. 34-A M.R.S. § 11222(4-A). Lifetime registrants are now subject to quarterly verification in writing and in-person verification once every five years. *Id.* § 11222(4-B). Additionally, if a law enforcement agency with jurisdiction over a registrant or the State Bureau of Identification has "reason to believe the [registrant's] appearance has changed

---

[6] None of the Does were removed from the registry as a result of the latest amendments in P.L. 2009, ch. 570 (effective Mar. 30, 2010) (codified at 34-A M.R.S. §§ 11202-A, 11222, 11225-A). Instead, they were removed as a result of the enactment of P.L. 2009, ch. 365, § B-3 (effective Sept. 12, 2009) (codified at 34-A M.R.S. § 11202-A(1) (2009)), which allowed Does meeting certain criteria to be removed from the registry if they were convicted between January 1, 1982 and September 18, 1999.

6

significantly," the agency or Bureau may instruct the registrant to appear in person with a current photograph or to allow a new photograph to be taken, or may instruct the registrant to submit a new photograph without appearing in person. *Id.* § 11222(4-A)(C)(1)-(2), (4-B)(C)(1)-(2).

[¶7]  John Does I, IV, V,[7] VI, VIII, and XVI were initially required to register, but successfully petitioned to be removed.  John Doe XXIV was also required to register, but he obtained a temporary restraining order preventing his information from being publically posted; he later successfully petitioned for removal from the registry.  John Does VII, XIII, and XVIII obtained temporary restraining orders relieving them from registering, and they were also statutorily relieved of the registration requirement.  John Does III, X, XIX, XXIII, and XLIII[8] remain on the registry and have viable claims.

[¶8]  The Does and State defendants filed cross-motions for summary judgment.   The trial court issued its decision on the cross-motions on August 18, 2011, denying the Does' motion on all of their claims, and granting the State defendants' motion for summary judgment.  The court concluded that the

---

[7]  John Doe V was removed from the registry after the parties submitted their briefs, but prior to oral argument.

[8]  John Doe XLIII is not currently on the registry because he obtained a temporary restraining order, but he is ineligible to be relieved from the registration requirement because he does not meet the requirements of 34-A M.R.S. § 11202-A(1)(C).

cases of the Does who successfully petitioned to be relieved from the duty to register were moot, and that SORNA of 1999 as amended after *Letalien* was constitutional. The court also denied the Does' motion for attorney fees.

[¶9] The Does make numerous claims on appeal, namely that (A) the claims of the John Does who are no longer required to register as sex offenders are not moot; (B) SORNA of 1999 is an unconstitutional ex post facto law; (C) SORNA of 1999 violates article I, section 1 of the Maine Constitution; (D) SORNA of 1999 violates their procedural due process rights; (E) SORNA of 1999 violates their substantive due process rights; (F) SORNA of 1999 violates the Equal Protection Clauses of the Maine and United States Constitutions; (G) SORNA of 1999 violates the Maine Civil Rights Act (MCRA), 5 M.R.S. §§ 4681-4685 (2012); (H) SORNA of 1999 violates 42 U.S.C.S. § 1983 (Lexis 2012); (I) summary judgment was improperly granted; and (J) they are entitled to an award of attorney fees.

## II. STANDARD OF REVIEW

[¶10] This case comes before us on a grant of summary judgment in favor of the State defendants, which we review de novo and will affirm "if the record reflects that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law." *Levesque v. Androscoggin Cnty.*, 2012 ME 114, ¶ 5, 56 A.3d 1227 (quotation marks omitted). Because we find that there are no

genuine issues of material facts in dispute, we evaluate whether the State defendants are entitled to a judgment as a matter of law. Summary judgment is properly granted when "the plaintiff fails to establish a prima facie case for each element of [his] cause of action." *Id.* (quotation marks omitted).

[¶11] The Does' arguments based on procedural and substantive due process, equal protection, and the Ex Post Facto Clause challenge the constitutionality of SORNA of 1999. Accordingly, the Does have "the burden of establishing [the statute's] infirmity." *See Letalien*, 2009 ME 130, ¶ 15, 985 A.2d 4 (quotation marks omitted). We review challenges to the validity of statutes de novo. *Id.* We presume that the statute is constitutional, *id.*, and must "avoid an unconstitutional construction of a statute if a reasonable interpretation of the statute would satisfy constitutional requirements," *Bagley v. Raymond Sch. Dep't*, 1999 ME 60, ¶ 14, 728 A.2d 127 (quotation marks omitted).

## III. DISCUSSION

[¶12] We consider the Does' challenges in the order the Does argue them.

A. Justiciability

[¶13] The Superior Court determined that the claims of the Does who had been removed from the registry are moot because the court could not provide them any real or effective relief. These Does argue that their claims are not moot because (1) they will be subject to the registry if they commit future crimes or

move to a different state, (2) their claims fit within the exceptions to the mootness doctrine, and (3) the court can retain jurisdiction in order to award costs and attorney fees.

1.    Technical Mootness

[¶14]   We review de novo the trial court's determination of mootness. *McGettigan v. Town of Freeport*, 2012 ME 28, ¶ 10, 39 A.3d 48.   "An issue is moot when there is no real and substantial controversy, admitting of specific relief through a judgment of conclusive character."   *Id.* (quotation marks omitted).   In analyzing whether a case is moot, "we examine whether there remain sufficient practical effects flowing from the resolution of the litigation to justify the application of limited judicial resources."   *Id.* (quotation marks omitted).

[¶15]  The Does' first argument, that their future conduct may subject them to registration in the future, is insufficient to constitute a "real and substantial controversy."   *See id.*   For a controversy to be justiciable it must declare rights "upon the existing state of facts and not upon a state of facts that may or may not arise in the future."   *See Madore v. Me. Land Use Regulation Comm'n*, 1998 ME 178, ¶ 7, 715 A.2d 157 (quotation marks omitted).   Here, the Does have alleged only facts that may or may not occur in the future, and thus their claims are moot.

[¶16]  Additionally, the Does have been relieved of the duty to register, the crux of the litigation.  *See, e.g.*, *Bennett v. State*, 289 A.2d 28, 28, 32 (Me. 1972) (holding that the expiration of defendant's sentence rendered his habeas corpus petition moot); *State v. Irish*, 551 A.2d 860, 861-62 (Me. 1988) (holding that the defendant's constitutional challenge to the revocation of his intensive supervision was moot because he had been released from institutional confinement).

[¶17]  Further, because we conclude that the Does are not entitled to an award of their fees and costs, there is no need for the trial court to retain jurisdiction over their claim.

[¶18]  For these reasons, the claims of Does I, IV, V, VI, VII, VIII, XIII, XVI, XVIII, and XXIV, who have been removed from the registry, no longer have controversial vitality and are therefore moot unless an exception applies.

2.    Exceptions to Mootness

[¶19]  The Does' claims also do not fit within the exceptions to the mootness doctrine.  We will consider an appeal that is otherwise moot if the appellant can show that

> (1) sufficient collateral consequences will result from the determination of the questions presented so as to justify relief; (2) the appeal contains questions of great public concern that, in the interest of providing future guidance to the bar and the public, we may address; or (3) the issues are capable of repetition but evade review because of their fleeting or determinate nature.

*Anthem Health Plans of Me., Inc. v. Superintendent of Ins.*, 2011 ME 48, ¶ 8, 18 A.3d 824 (quotation marks omitted).

[¶20] Here, the collateral consequences exception is unavailable. The Does argue that their registration status may be affected if they commit another crime or move to another state. The collateral consequences exception will not apply if the appellant fails to "demonstrate that a decision on the merits of the appeal will have more than conjectural and insubstantial consequences in the future." *Sordyl v. Sordyl*, 1997 ME 87, ¶ 6, 692 A.2d 1386 (quotation marks omitted). These consequences to the Does' registration status that may or may not transpire in the future and which are entirely dependent on the Does' own actions do not fall under the collateral consequences exception. Additionally, the Does' argument that their claims may have a potential impact on federal funding of Maine law enforcement is too tenuous and uncertain to be a collateral consequence.

[¶21] The two remaining exceptions to mootness, for issues of great public concern and issues capable of repetition, are also unavailable to the Does who have been removed from the registry. Although it is true that the application of SORNA of 1999 is an issue of great public concern that is capable of repetition, the issue will not evade review because the cases of Does III, X, XIX, XXIII, and XLIII, who remain on the registry, are decided today. Therefore, the claims of the Does who had been removed from the registry are moot.

12

B.    Ex Post Facto Analysis

[¶22]   The remaining Does argue that SORNA of 1999 as amended after *Letalien* is an unconstitutional ex post facto law.  The trial court concluded that the Does failed to establish by the clearest proof that SORNA of 1999 is punitive.

[¶23]   Both the United States and Maine Constitutions prohibit the enactment of ex post facto laws.  U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . ex post facto Law . . . ."); Me. Const. art. I, § 11 ("The Legislature shall pass no . . . ex post facto law . . . .").  We have explained that the Ex Post Facto Clauses of the two constitutions "are interpreted similarly and are coextensive."  *Letalien*, 2009 ME 130, ¶ 25, 985 A.2d 4.  A statute violates the Ex Post Facto Clauses if it "makes more burdensome the punishment for a crime after it has been committed."  *Id.*

[¶24]  In making that determination, we employ the two-step "intent-effects test," in which we first analyze the Legislature's intent in enacting the statute.  *See Smith v. Doe*, 538 U.S. 84, 92 (2003); *Letalien*, 2009 ME 130, ¶ 29, 985 A.2d 4.  If we determine that the intent of the statute is civil in nature, we then analyze the statute's effects to determine whether the effects are so punitive that they overcome the Legislature's civil intent.  *Smith v. Doe*, 538 U.S. 84, 92 (2003); *Letalien*, 2009 ME 130, ¶ 29, 985 A.2d 4.  We have already concluded that "SORNA was intended to be a civil, regulatory statute" under the intent aspect of

the analysis. *Letalien*, 2009 ME 130, ¶ 29, 985 A.2d 4. Therefore, our focus is on the second step of the inquiry—assessing the statute's effects to determine if they are punitive. *See id.* ¶ 30.

[¶25] In analyzing the effects of SORNA of 1999, we consider the seven factors we discussed in *Letalien*, commonly referred to as the *Mendoza-Martinez* factors. Reformulated as questions, the seven factors are (1) does the sanction involve an affirmative disability or restraint?, (2) has the sanction been historically regarded as punishment?, (3) is the sanction imposed only upon a finding of scienter?, (4) does the operation of the sanction promote retribution and deterrence?, (5) is the behavior to which it applies already a crime?, (6) is there an alternative purpose to which the sanction may rationally be connected?, and (7) is the sanction excessive in relation to the alternative purpose?. *See Letalien*, 2009 ME 130, ¶ 31, 985 A.2d 4 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

[¶26] In order for us to conclude that SORNA of 1999 is an unconstitutional ex post facto law, the Does must, through the *Mendoza-Martinez* factors, "demonstrate by the clearest proof that the statute is so punitive in purpose or effect as to overcome the Legislature's civil intent." *See State v. Cosgro*, 2008 ME 64, ¶ 2, 945 A.2d 1221 (quotation marks omitted).

14

[¶27]   *Letalien* is the point of departure for our analysis of the constitutionality of SORNA of 1999 under the Ex Post Facto Clauses of the United States and Maine Constitutions.  In *Letalien*, we concluded that the statute

> impose[d] an ex post facto punishment as to offenders sentenced in the years before the effective date of SORNA of 1999 *for whom registration was a required part of their sentence* and who were subsequently made subject to the more burdensome requirements of SORNA of 1999 after its effective date of September 18, 1999.

2009 ME 130, ¶ 1, 985 A.2d 4 (emphasis added).

[¶28]   There are numerous factual distinctions between the plaintiff in *Letalien* and Does III, X, XIX, XXIII, and XLIII who are before us today.  Unlike Letalien, who was required to register as a sex offender as part of his criminal sentence, *id.* ¶ 5, there was no sex offender registration law at the time the Does were originally sentenced, *see Doe*, 2007 ME 139, ¶¶ 10, 14, 932 A.2d 552.  The registration requirement of Letalien's sentence included a waiver provision that was eliminated in 2001.  *Letalien*, 2009 ME 130, ¶ 8, 985 A.2d 4.  In contrast, the registration requirement originally imposed on the Does by SORNA of 1999 has been alleviated by the enactment of 34-A M.R.S. § 11202-A, which allows sex offenders to remove their names from the registry if they fall within the exceptions created by the statute.  Reporting requirements also differ.  Letalien was required to report in person to law enforcement officials every ninety days.  *Letalien*, 2009 ME 130, ¶ 8, 985 A.2d 4.  Pursuant to the current law, ten-year registrants are

only required to report annually in writing and in person every five years; lifetime registrants are required to report quarterly in writing and in person every five years.[9] 34-A M.R.S. § 11222(4-A), (4-B).

[¶29] Against that backdrop, we evaluate each of the seven *Mendoza-Martinez* factors in turn.

1. Affirmative Disability or Restraint

[¶30] The first factor requires us to determine whether SORNA of 1999 imposes an affirmative disability or restraint. We consider "'how the effects of the [a]ct are felt by those subject to it. If the disability or restraint is minor and indirect, its effects are unlikely to be punitive.'" *Letalien*, 2009 ME 130, ¶ 35, 985 A.2d 4 (alteration in original) (quoting *Smith*, 538 U.S. at 99-100).

[¶31] In *Letalien* we held that this factor weighed in favor of finding the statute punitive because of the great burden associated with a registrant appearing in person every ninety days and being subjected to fingerprinting, photographing, and verification of residence and employment information. *Id.* ¶ 37. Since *Letalien*, the burden imposed by the registration requirements of SORNA of 1999 has been significantly reduced. Now ten-year and lifetime registrants are required

---

[9] In addition, registrants are required to report to law enforcement officials when they move or change employment, and must update their registrations if they significantly change their appearance. 34-A M.R.S. § 11222(4-A), (4-B).

16

to appear in person every five years, which is no more onerous than renewing one's driver's license. *See* 29-A M.R.S. § 1406(1) (2012) (requiring noncommercial license renewal every six years and commercial license renewal every five years). Similarly, the burden of reporting in writing annually for ten-year registrants or quarterly for lifetime registrants is minimal when compared to an in-person reporting requirement.

[¶32] The Does argue that it is punitive to require that registrants submit a new photograph when a registrant's appearance has changed significantly. The Supreme Court analyzed a similar requirement in *Smith*, holding that the Alaska statute imposed no affirmative disability or restraint because "[a]lthough registrants must inform the authorities after they change their facial features (such as growing a beard) . . . they are not required to seek permission to do so." 538 U.S. at 101; *see State v. Haskell*, 2001 ME 154, ¶ 15, 784 A.2d 4 (finding no affirmative disability or restraint because the "movements and activities [of the registrants were] not restricted in any way").

[¶33] We conclude that SORNA of 1999 imposes no significant restraint or disability, and that therefore this factor weighs against finding the statute punitive.

2. Historically Regarded as Punishment

[¶34] The second factor we examine is whether the sex offender registry has historically been regarded as punishment. The Does argue that the registry's

availability on the Internet is punitive because of its stigmatizing effects. The Supreme Court found that "[t]he purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender. Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation." *Smith*, 538 U.S. at 99. In *Letalien*, we concluded that posting the registry on the Internet was not punitive "for the reasons articulated by the Supreme Court in *Smith*." 2009 ME 130, ¶ 38, 985 A.2d 4.

[¶35] However, our analysis of this factor does not end there. "The unique history of the development of sex offender registration laws in Maine is integral" to our analysis of whether the retroactive application of SORNA of 1999 should be regarded as punishment. *See Letalien*, 2009 ME 130, ¶ 39, 985 A.2d 4. The Sex Offender Registration Act of 1991, the original sex offender registration law enacted in Maine, and the Sex Offender Registration and Notification Act of 1995, which affected Letalien, made registration an "integral part of the sentencing process and, thus, the resulting sentence." *Id.* ¶¶ 39, 42. SORNA of 1999, on the other hand, is not tied to the sentencing process; this is the crucial distinction upon which *Letalien* was based. *See id.* ¶¶ 1, 39, 60-61. We conclude that this factor weighs against finding the statute punitive.

18

### 3. Scienter

[¶36]  The third factor is whether the statute comes into play only on a finding of scienter.  Because SORNA of 1999 is not triggered on a finding of scienter, this factor weighs against finding SORNA punitive.  *See id.* ¶ 44; *Haskell*, 2001 ME 154, ¶ 17, 784 A.2d 4.

### 4. Promote Traditional Aims of Punishment

[¶37]  The fourth factor requires us to determine whether SORNA of 1999 promotes the traditional aims of punishment, specifically, retribution and deterrence.  The Does argue that SORNA of 1999 is retributive because it imposes registration obligations on them for past wrongdoing even though some of them have gone decades without reoffending; additionally, they argue that it is a deterrent because they are subject to increased supervision by the State and increased scrutiny by the public.

[¶38]  In considering this factor in *Smith*, the Supreme Court concluded that although the Alaska sex offender registration scheme may deter future crimes, such a finding did not warrant a finding that the registration statute was punitive because "[a]ny number of governmental programs might deter crime without imposing punishment."  538 U.S. at 102.  Further, even though the Alaska registration scheme differentiated among individuals based on the extent of their wrongdoing,

the corresponding length of the reporting requirements was "reasonably related to the danger of recidivism, and this is consistent with the regulatory objective." *Id.*

[¶39] In *Letalien*, we concluded that given the differences between *Smith* and *Letalien* in the length of registration for certain offenses, the sparse record provided "little basis to assess the reasonableness of this widely disparate treatment and whether Maine's requirement of lifetime registration is reasonably related to the danger of recidivism." 2009 ME 130, ¶ 46, 985 A.2d 4.

[¶40] We are unable to determine on this record whether SORNA of 1999 is more deterrent in effect than other civil regulatory schemes. Likewise, on the record presented we cannot assess whether the registration requirements are reasonably related to the danger of recidivism. *See id.* Thus, we treat this factor as neutral. *See id.*

5.      Whether Behavior is Already a Crime

[¶41] The fifth factor we examine is whether the behavior to which SORNA of 1999 applies is already a crime. We determined in *Letalien* that the fifth factor weighed in favor of finding the statute punitive because it "applie[d] exclusively to behavior that is already a crime." *Id.* ¶ 48. For that same reason, we agree that this factor supports a finding that the statute is punitive.

6.     Rational Connection to Alternative Purpose

[¶42] The sixth factor is whether there is an alternative purpose rationally connected to the statute. We determined in *Letalien* that SORNA of 1999 "serves a valid governmental purpose separate from punishment" because it is "among the most basic obligations state government owes its people—ensuring their safety." *Id.* ¶ 50. We discern no reason to depart from the determination we reached in *Letalien* and thus conclude that this factor weighs against finding that SORNA is punitive.

7.     Excessive in Relation to Alternative Purpose

[¶43] The seventh and final factor requires us to determine whether the statute appears excessive in relation to its public safety purpose. The Does contend that requiring an individual previously convicted for a sex offense to register if he is later convicted of a non-sex-related offense punishable by more than one year is excessive. We analyze excessiveness as it relates to the increased burdens on individuals who were originally sentenced before any statute requiring registration of sex offenders had been enacted and are now retroactively subject to ten-year or lifetime registration on the State's sex offender registry. "The excessiveness inquiry . . . is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is

whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 105.

[¶44] Although the statutory reporting requirements of SORNA of 1999 are less stringent and oppressive than those we considered in *Letalien*, we nevertheless conclude again that we have insufficient information upon which to determine whether they are reasonable in light of the law's nonpunitive purpose of public safety. *Letalien*, 2009 ME 130, ¶ 52, 985 A.2d 4. The record does not allow us to determine whether a less demanding regimen would serve the objective of public safety equally well. We accordingly treat this factor as neutral. *See id.* ¶ 55.

8. Assessment of *Mendoza-Martinez* Factors

[¶45] The Does argue that a conviction-based scheme is inherently punitive and that the Legislature should implement a risk-assessment scheme. However, "[i]t is not our role to ask whether the Legislature could achieve its goals through alternative means." *Id.* ¶ 56. Our task is to determine whether the punitive effects of SORNA of 1999 overcome the Legislature's civil intent by the clearest proof. *See Cosgro*, 2008 ME 64, ¶ 2, 945 A.2d 1221.

[¶46] Our ex post facto analysis in *Letalien* was informed and driven in significant part by the fact that registration was part of Letalien's criminal sentence. *See Letalien*, 2009 ME 130, ¶¶ 60-61, 985 A.2d 4. Indeed, "the purpose of the ex post facto prohibition is rightfully considered to be at its apex when a

law's retroactive application is more punitive than the punishment that was actually imposed against an offender as part of a sentence." *Id.* ¶ 61. By definition, it was punitive to increase Letalien's sentence retroactively. Further, it was the cumulative effect of a combination of factors that produced a finding that the statute was unconstitutional in *Letalien*. That is simply not the case here, where registration was not part of the Does' sentences and where some of the most significant concerns we had in *Letalien* have been remedied by the Legislature.

[¶47] In our present discussion of the *Mendoza-Martinez* factors, we conclude that only factor five—whether the statute applies to behavior that is already a crime—weighs in favor of finding SORNA of 1999 punitive.

[¶48] The first *Mendoza-Martinez* factor, which is whether the statute imposes an affirmative disability or restraint, looms large in our conclusion that the statute is nonpunitive overall. Title 34-A M.R.S. § 11222 significantly reduced the burden on individuals subject to the registry. We disagree with the Does' argument that requiring lifetime registration is a significant restraint in and of itself. Regardless of the length of time an individual is subject to the registry, reporting to have his registration information verified in person every five years is a minimal burden, as is reporting in writing no more frequently than quarterly.

[¶49] Additionally, factor six, regarding the important and rational connection to a nonpunitive purpose—providing truthful information in

furtherance of public safety—underscores our conclusion that the statute is nonpunitive. *See Haskell*, 2001 ME 154, ¶ 9, 784 A.2d 4 ("[T]he Supreme Court has intimated, in other cases, that the most significant question under the effects stage of the analysis is whether the law, 'while perhaps having certain punitive aspects, serve[s] important nonpunitive goals.'" (alteration in original) (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996))).

[¶50]  Factor four, whether the statute promotes traditional aims of punishment, and factor seven, whether the statute is excessive in relation to the alternate purpose, are found to be neutral; accordingly, they do not weigh heavily in our analysis.

[¶51]  After considering all of the *Mendoza-Martinez* factors, we conclude that SORNA of 1999 is nonpunitive.  As such, it does not violate the Ex Post Facto Clauses of the United States and Maine Constitutions.

C.    Equal Protection

[¶52]  The Does argue that SORNA of 1999 violates the Equal Protection Clauses of the United States and Maine Constitutions because its registration requirements infringe on the Does' fundamental rights under article I, section 1 of the Maine Constitution and are not narrowly tailored to achieve a compelling governmental interest.  In the alternative, the Does argue that SORNA of 1999 unlawfully and arbitrarily treats them differently from similarly situated sex

offenders in requiring some offenders to register for ten years and others for life. The Superior Court found that SORNA of 1999 does not implicate a suspect class or a fundamental right, and concluded that the Does failed to establish that the statute treats them differently from similarly situated persons in a way that is not rationally related to a legitimate state interest.

[¶53] The Fourteenth Amendment's Equal Protection Clause prohibits "any state from denying to any person within its jurisdiction the equal protection of the laws, and requires, generally, that persons similarly situated be treated alike. Article [I], section 6-A of the Maine Constitution includes similar requirements." *Anderson v. Town of Durham*, 2006 ME 39, ¶ 28, 895 A.2d 944 (citations and quotation marks omitted); *see* U.S. Const. amend. XIV, § 1 ("[N]or shall any State . . . deny to any person within its jurisdiction the equal protection of the laws."); Me. Const. art. I, § 6-A ("No person shall be . . . denied the equal protection of the laws . . . .").

[¶54] In an equal protection challenge, a state law is subject to strict scrutiny analysis if it "infringes on a fundamental constitutional right, or involves . . . a suspect classification." *Anderson*, 2006 ME 39, ¶ 29, 895 A.2d 944. If strict scrutiny applies, the law must be narrowly tailored to achieve a compelling governmental interest. *Id.* "If the government action does not implicate either a fundamental right or a suspect class, different treatment accorded to similarly

situated persons need only be rationally related to a legitimate state interest." *Id.* (quotation marks omitted). Laws subject to rational basis review "bear[] a strong presumption of validity." *Id.* "[T]he burden is on the party challenging the government action to demonstrate that there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals." *Id.* (quotation marks omitted).

[¶55] As persons convicted of sex offenses, the Does are not members of a suspect or protected class for purposes of an equal protection challenge. *See, e.g.*, *United States v. Juvenile Male*, 670 F.3d 999, 1009 (9th Cir. 2012); *Doe v. Moore*, 410 F.3d 1337, 1346 (11th Cir. 2005). Additionally, the Does have not established that SORNA of 1999 infringes on a fundamental constitutional right; they merely refer generally to article I, section 1 of the Maine Constitution[10] and argue in greater detail with regard to substantive due process that a fundamental right is implicated. As we will discuss in our substantive due process analysis, we do not find that SORNA of 1999 implicates a fundamental constitutional right. Accordingly, the Does' equal protection challenge is subject to the highly deferential rational basis review. *See Anderson*, 2006 ME 39, ¶ 29, 895 A.2d 944;

---

[10] Article I, section 1 of the Maine Constitution provides, "All people are born equally free and independent, and have certain natural, inherent and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness."

*Haskell*, 2001 ME 154, ¶ 16 n.10, 784 A.2d 4 (SORNA's classifications "need only be rationally related to a legitimate government goal.").

[¶56]  In order "[t]o succeed in an equal protection challenge where, as here, the challenging party is not a member of a suspect class" and has not had a fundamental right infringed, the Does "must show (1) that similarly situated persons are not treated equally under the law, and (2) that the statute is not rationally related to a legitimate state interest."  *See MacImage of Me., LLC v. Androscoggin Cnty.*, 2012 ME 44, ¶ 33, 40 A.3d 975 (quotation marks omitted).

[¶57]  The Legislature has required individuals who are convicted of certain sex offenses to register for ten years while requiring others who are convicted of a "sexually violent offense" or multiple sex offenses to register for life.  *See* 34-A M.R.S. § 11203(5), (8).  Although all registrants are labeled "sex offenders," the Does have not established that ten-year registrants are similarly situated to lifetime registrants because different conduct triggers the different durational requirements.  *See Green v. Comm'r of Mental Health & Mental Retardation*, 2000 ME 92, ¶ 22, 750 A.2d 1265 ("There is a good argument that insanity acquittees and individuals civilly committed are not similarly situated for purposes of equal protection analysis because of the difference in circumstances giving rise to their commitment.").  Contrary to the Does' argument that all sex offenders are

similarly situated, the law does not treat offenders convicted of particular offenses differently because SORNA of 1999 is a conviction-based system.[11]

[¶58] We do not reach the second step in the analysis given our conclusion that the Does are not similarly situated to other sex offenders who are treated differently and the Does' concessions (1) that protecting the public through publicizing offender information is a compelling state interest and (2) that we have previously held that the sex offender registration statutes were enacted to serve the legitimate governmental purpose of public safety. *See Letalien*, 2009 ME 130, ¶ 50, 985 A.2d 4.

[¶59] For these reasons, SORNA of 1999 does not violate the Equal Protection Clauses.

D.   Procedural Due Process

[¶60] The Does argue that the classification scheme of SORNA of 1999 implies that they are "dangerous" and therefore they are entitled to challenge that classification at a hearing pursuant to the Due Process Clause. The trial court concluded that the Does were not entitled to a hearing to establish whether they are

---

[11] The Does also argue that similarly situated Does can end up in different categories as a result of prosecutorial discretion. However, "[i]t is well established that a reasonable prosecutorial discretion in the enforcement of criminal laws is inherent in our criminal justice system," and the Does do not claim that "selective enforcement was deliberately made on an impermissible and unjustifiable standard such as race, religion, a desire to discourage the exercise of one's constitutional rights or other invidious criteria." *See State v. Heald*, 382 A.2d 290, 301 (Me. 1978).

potentially dangerous because that fact is immaterial with regard to their duty to register.

[¶61] The Maine and United States Constitutions create coextensive due process rights. *Northup v. Poling*, 2000 ME 199, ¶ 9 n.5, 761 A.2d 872. "We review a procedural due process claim in two steps. First, we determine if the government has deprived a claimant of life, liberty, or property interests. Second, if such deprivation occurred, we then determine what process, pursuant to the Fourteenth Amendment, is due . . . ." *DaimlerChrysler Corp. v. Me. Revenue Servs.*, 2007 ME 62, ¶ 26, 922 A.2d 465 (citations omitted).

[¶62] The Supreme Court has articulated the "stigma-plus test" to determine whether procedural due process rights[12] are implicated when the state imposes a stigma on an individual that negatively affects his reputation. *See Paul v. Davis*, 424 U.S. 693, 701, 711 (1976). A state action is an infringement on due process rights pursuant to the stigma-plus test only if it both negatively affects an individual's reputation and alters the legal status of an individual in a manner that affects his or her liberty, such as revoking parole or taking away the right to operate a vehicle. *Id.* at 701, 708-09. The Does' legal status is unaffected by

---

[12] The stigma-plus test "is limited to consideration of the procedural guarantees of the Due Process Clause and is not intended to describe those substantive limitations upon state action which may be encompassed within the concept of 'liberty' expressed in the Fourteenth Amendment." *Paul v. Davis*, 424 U.S. 693, 710 n.5 (1976).

SORNA of 1999.

[¶63] Other courts have held that sex offender registration requirements are not violations of due process under the stigma-plus test because registration does no more than make the fact of conviction public, just as SORNA of 1999 does here. *See, e.g.*, *Does v. Munoz*, 507 F.3d 961, 965-66 (6th Cir. 2007) (concluding that registration does not implicate a fundamental right because it disseminates accurate public information); *cf. Gwinn v. Awmiller*, 354 F.3d 1211, 1223-24 (10th Cir. 2004) (holding that liberty interests were implicated under the stigma-plus test where the defendant was *incorrectly* placed on a sex offender registry without any process). Because the registry contains no information that cannot be obtained through a routine criminal background check, the registry does not affect any of the Does' liberty or property interests, and we therefore need not reach the question of what process is due.

E.    Substantive Due Process

[¶64] The Does argue that SORNA of 1999 violates their fundamental rights to privacy, reputation, and property, and their ability to pursue happiness, and that the law is not narrowly tailored to serve a compelling state interest. The trial court concluded that the statute does not violate the Does' substantive due process rights because it does not infringe on any fundamental right and is reasonably related to a legitimate state interest.

30

[¶65]  We have previously determined that the substantive due process rights of the United States and Maine Constitutions are coextensive, *Green*, 2000 ME 92, ¶ 13 n.2, 750 A.2d 1265, and there is nothing presented in this case that causes us to reconsider that determination.  A substantive due process analysis turns on whether the challenged state action implicates a fundamental right:

> First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.  Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest.  Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking that direct and restrain our exposition of the Due Process Clause.

*Id.* ¶ 13 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)).  In addition to the rights expressly protected by the Bill of Rights, "the 'liberty' specially protected by the Due Process Clause includes the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion."  *Glucksberg*, 521 U.S. at 720 (citations omitted).  Courts must be cautious in recognizing fundamental rights that have not been clearly established because "extending constitutional protection to an asserted right or liberty interest . . . place[s] the matter outside the arena of public debate and legislative action."  *Id.*

[¶66]  If state action infringes on a fundamental right or fundamental liberty interest, the infringement must be narrowly tailored to serve a compelling state interest.  *Id.* at 721.  If the challenged state action does not implicate a fundamental right or fundamental liberty interest, it will be upheld if it is reasonably related to a legitimate state interest.  *Id.* at 722.

[¶67]  We conclude that no fundamental liberty interest or fundamental right is implicated by SORNA of 1999.  In particular, the right to privacy alleged by the Does, i.e., the right to keep private the fact of conviction, is inapposite to the right to personal autonomy often described as a right to privacy by the Supreme Court regarding family relationships and bodily integrity.  Other courts have also concluded that no fundamental right is implicated by disclosure of truthful public information.  *See, e.g.*, *Paul*, 424 U.S. at 713 (holding that publication of a record of an official act, such as an arrest, does not implicate any fundamental right); *Moore*, 410 F.3d at 1345 ("[W]e can find no history or tradition that would elevate the issue here to a fundamental right. . . . [A] state's publication of truthful information that is already available to the public does not infringe the fundamental constitutional rights of liberty and privacy."); *Doe v. Tandeske*, 361 F.3d 594, 597 (9th Cir. 2004) ("[P]ersons who have been convicted of serious sex offenses do not have a fundamental right to be free from the registration and notification requirements . . . ."); *In re W.M.*, 851 A.2d 431, 451 (D.C. 2004)

32

("Under [the Sex Offender Registration Act] and its implementing regulations . . . only truthful and accurate information of a non-confidential, mainly public nature is disclosed.").

[¶68]   We do not here establish a new fundamental interest or right. Because no fundamental right or interest is at stake and the Does have conceded that SORNA of 1999 is reasonably related to a legitimate state interest, *see Letalien*, 2009 ME 130, ¶ 50, 985 A.2d 4, the Does' substantive due process challenges must fail.

F.     Use of Guilty Pleas

[¶69]   The Does argue that SORNA of 1999's registration requirements exact more punishment than the Does agreed to in their plea bargain agreements and they urge us to recognize a right of fundamental fairness under Maine's Constitution and to find a violation of the Does' right to contract.  Because we have concluded that SORNA of 1999 is not punitive under an ex post facto analysis and implicates no fundamental rights, we do not find merit in this argument.

G.     Rights Afforded by the Maine Constitution

[¶70]  The Does urge us to establish a fundamental right to privacy, a right to protection of reputation, and a right to fundamental fairness under article I, section 1 of the Maine Constitution.  We have already held that SORNA of 1999

does not implicate fundamental rights of privacy and reputation under the Maine Constitution in the context of the Does' procedural and substantive due process claims. We also decline to expand our interpretation of Maine's Constitution to include a generalized right to "fundamental fairness." *See Bagley*, 1999 ME 60, ¶ 13, 728 A.2d 127 ("[W]e have traditionally exercised great restraint when asked to interpret our state constitution to afford greater protections than those recognized under the federal constitution." (quotation marks omitted)).

H.     MCRA and § 1983

[¶71] The Does seek prospective relief to protect them from registering in the future, and an award of the costs associated with registering and the fees associated with removing their names from the registry. The trial court denied the Does' monetary claims, finding that they had not sought any prospective relief and that their claim for reimbursement was tantamount to an award of damages and was thus prohibited.

[¶72] Title 42 U.S.C.S. § 1983 states that "[e]very person who, under color of any [state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." The MCRA, 5 M.R.S. §§ 4681-4685, is patterned after § 1983 and "provides a private cause of action for violations of constitutional rights by 'any person.'"

*Jenness v. Nickerson*, 637 A.2d 1152, 1158 (Me. 1994). The Does have failed to establish that SORNA of 1999 violated their constitutional rights, thus barring their claim for prospective relief, which they first raised on appeal.

[¶73] We also conclude that the Does cannot claim a refund for the $31 they paid to remove their names from the registry. The State's sovereign immunity bars retroactive recovery of payments voluntarily made to the State. *See Wellman v. Dep't of Human Servs.*, 574 A.2d 879, 884 (Me. 1990) (holding that sovereign immunity barred retroactive recovery of any previously made payments). The Does voluntarily paid the fee. *See State v. Van Reenan*, 355 A.2d 392, 395 (Me. 1976) (concluding that a defendant who voluntarily submitted to a breath test in order to avoid having his license suspended pursuant to a statute could not challenge the constitutionality of that statute because he was not subject to the sanctions of which he complained.).

[¶74] A state, including a state official in his or her official capacity, is not a person within the meaning of § 1983 or the MCRA, barring the Does' additional monetary claims. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64, 71 (1989); *Jenness*, 637 A.2d at 1158. We are not persuaded by the re-stylization of the Does' damage claims as anything other than monetary compensation from alleged past violations. The court did not err in dismissing the Does' monetary claims.

I.   Summary Judgment

[¶75]   The Does contend that the factual record on summary judgment was inadequate for the trial court to rule on the parties' cross-motions.   In particular, they contend that there were insufficient facts for the court to decide the Does' equal protection and procedural and substantive due process claims.

[¶76]   We are not persuaded by the Does' arguments that the record was inadequate.   Parties opposing summary judgment, in this case the Does, have the burden of presenting sufficient evidence to generate a genuine issue of material fact.   *See* M.R. Civ. P. 56(c) ("Judgment shall be rendered . . . if . . . there is no genuine issue as to any material fact . . . ."); *Estate of Pinkham v. Cargill, Inc.*, 2012 ME 85, ¶ 16, 55 A.3d 1 (evaluating whether the plaintiff "presented enough evidence to create a genuine issue of material fact"); *Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 30, 974 A.2d 276 ("Because [plaintiff] has failed to raise a genuine issue of material fact . . . the court did not err in entering a summary judgment for [the defendant] . . . .").   The Does failed to do so here.

[¶77]   In their ex post facto argument, but not in their summary judgment argument, the Does refer to factual disputes they claim warranted the denial of the State defendants' cross-motion for summary judgment.   Two facts were in the Does' statement of material facts and denied by the State defendants.   The first concerns the relationship between the number of convictions and the risk of

recidivism: "There is no empirical evidence and no accepted professional opinion that a person who committed two Class A sex offenses before 1985 would be more dangerous in 2010 as a sex offender than one who committed one such offense before 1985." The second fact concerns whether there is a relation between sex offenders who commit non-sex offenses and public safety risks:

> There is no empirical evidence and no accepted professional opinion that a sex offender who committed one sex offense before 1995 followed by a Class C or higher offense unrelated to sexual activity is therefore more dangerous as a sex offender in 2010 than a pre 1995 sex offender who has not committed a separate [C]lass C or higher offense after his sex offense but unrelated to any sexual activity.

In their reply brief, the Does identify two additional facts included in the State defendants' statement of material facts that the Does denied, and which relate to the rate of recidivism over time.[13]

[¶78] In the final analysis, the disagreement between the Does and the State on the disputed facts does not concern material issues that the trial court would necessarily address in further proceedings. Instead, they constitute policy considerations that are appropriately addressed to the legislative process. The fact that the parties do not agree upon them or their import is not an impediment to

---

[13] The two facts, with their citations omitted, are (1) "Over time, the cumulative rate of recidivism increases"; (2) "The recidivism rates for STATIC-99 show that cumulative re-offense rates are higher at 15 years than 5 years." The Does identify four other facts in their reply brief, but the Does admitted those facts.

summary judgment. We therefore conclude that the Does' arguments that summary judgment was improperly granted are unpersuasive.

J.    Attorney Fees

[¶79]  Does I, III, IV, V, VI, VII, VIII, X, XIII, XVI, XVIII, XXIV, and XLIII argue that they should receive an attorney fees award as prevailing parties pursuant to § 1983 and the MCRA.  The trial court concluded that the Does were not entitled to recover attorney fees because they did not prevail on their motion for summary judgment.  The court also found that the "catalyst theory" was an unavailable avenue for recovering attorney fees pursuant to Maine law, and even if it were available, the Does were not entitled to recover pursuant to that theory.

[¶80]  The trial court may award attorney fees to a prevailing party "in any action or proceeding to enforce a provision of § 1983."  *Bangs v. Town of Wells*, 2003 ME 129, ¶ 8, 834 A.2d 955; *see also* 42 U.S.C.S. § 1988(b) (Lexis 2012). The MCRA similarly provides that the court may award attorney fees to a prevailing party.  5 M.R.S. § 4683.  We review the trial court's "determination regarding prevailing party status for clear error," and review its denial of attorney fees for an abuse of discretion.  *Bangs*, 2003 ME 129, ¶ 7, 834 A.2d 955.

[¶81]  The trial court's finding that the Does were not prevailing parties is not clearly erroneous.  The court ruled in favor of the State defendants on all of the Does' claims.  *See Portland Co.*, 2009 ME 98, ¶ 32, 979 A.2d 1279.  Moreover,

the grant of temporary restraining orders does not satisfy the prevailing-party requirement. In the Does' case, "the preliminary injunction[s] . . . merely maintained the status quo, [they] did not effect a material alteration in the parties' legal relationship and the plaintiffs therefore [are] not prevailing parties under § 1988." *See Advantage Media, LLC v. City of Hopkins*, 511 F.3d 833, 837 (8th Cir. 2008).

[¶82] The Does argue that they are "prevailing parties" pursuant to the catalyst theory. The catalyst theory "posits that a plaintiff is a 'prevailing party' if [the lawsuit] achieves the desired result because [it] brought about a voluntary change in the defendant's conduct." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 601 (2001). The State defendants contend that the Supreme Court's rejection of the catalyst theory in *Buckhannon Bd. & Care Home, Inc.* foreclosed an award of attorney fees to the Does. *See* 532 U.S. at 600.

[¶83] The Does advance the catalyst theory in arguing that *Doe v. District Attorney* led to the enactment of P.L. 2009 ch. 365, § B-3 (effective date Sept. 12, 2009) (codified at 34-A M.R.S. § 11202-A(1) (2009)), providing for certain exceptions to the registration requirements, and the litigation in *Letalien*, leading to the legislative enactment of P.L. 2009 ch. 570 (effective date Mar. 30, 2010) (codified at 34-A M.R.S. §§ 11202-A, 11222, 11225-A), alleviating

the reporting requirements. The connection between their lawsuit and the legislative changes is too tenuous. In fact, at the time John Doe I's case reached us in *Doe*, the plaintiff had expressly *not* pursued an ex post facto claim.[14] Instead, our decision in *Letalien*, analyzing an ex post facto claim, triggered the recent legislative changes to 34-A M.R.S. § 11222. Because the legislative changes to SORNA of 1999 are not the result of this litigation, we do not address the catalyst theory further.

## IV. CONCLUSION

[¶84] For the foregoing reasons, we affirm the trial court's decision that SORNA of 1999 is not an unconstitutional ex post facto law. The Does' other constitutional and statutory challenges are unpersuasive.

The entry is:

> Judgment affirmed.

SILVER, J., with whom ALEXANDER and JABAR, JJ., join, dissenting.

[¶85] We respectfully dissent because the requirements of SORNA of 1999 are punishment to those who have completed their sentences and paid back society

---

[14] "At oral argument, Doe's counsel stated that he was not requesting that we reconsider whether SORNA is ex post facto as he recognized that *State v. Haskell*, and *Smith v. Doe*, had decided the issue." *Doe*, 2007 ME 139, ¶ 21 n.4, 932 A.2d 552 (citations omitted).

long ago. As we have already learned, tragically, here in Maine, the publication of names and pictures on the Internet is dangerous and dramatically affects the registrants' lives. *See* Associated Press, *2 Sex Offenders Shot to Death in Their Homes*, N.Y. Times, Apr. 17, 2006, at A14; Raja Mishra, *Suspect May Have Wanted to Kill Others*, Boston Globe, Apr. 25, 2006, at B2. Those who do not comply with the requirements of SORNA of 1999 face criminal sanctions similar to those imposed on defendants who violate conditions of release or probation. The requirements of SORNA of 1999, as they affect these Does, are ex post facto laws that violate the United States and Maine Constitutions. Nowhere else in the realm of laws is such an ex post facto violation permitted.

[¶86] We do not dispute that the requirements of SORNA of 1999 may be enforced on persons whose sentences have been imposed since the requirements of SORNA of 1999 took effect. The propriety of applying SORNA of 1999 to current offenders is not at issue in this appeal. What is at issue is whether, after a person's sentence has been imposed, and after that sentence has been served, the State may add to the sentence new and onerous burdens and restrictions that were not authorized when the offender was sentenced. The constitutional requirements that govern this issue are not unique to SORNA of 1999. If the State can impose additional burdens and restrictions here, it can do it for completed sentences for

any other crime that society decides, in hindsight, was not subject to tough enough sanctions the first time around.

## I. UNITED STATES CONSTITUTION

[¶87]  There are several reasons why SORNA of 1999 is punishment and violates the United States Constitution.  A look at some of the *Mendoza-Martinez* factors shows that many of them weigh in favor of finding the statute punitive.

### A.     Affirmative Disability or Restraint

[¶88]  We determined in *State v. Letalien* that "SORNA of 1999 [prior to the ch. 570 amendment] impose[d] a disability or restraint that is neither minor nor indirect" because "quarterly, in-person verification of identity and location of home, school, and employment at a local police station, including fingerprinting and the submission of a photograph, for the remainder of one's life, is undoubtedly a form of significant supervision by the state."  2009 ME 130, ¶ 37, 985 A.2d 4.  Now, a lifetime registrant who was sentenced prior to September 18, 1999, is only required to report in writing every ninety days and report in person every five years, unless there has been a change in address or appearance.  34-A M.R.S. § 11222(4-B) (2012).  Admittedly, this is a lower physical burden on the offender than predecessor acts' requirements that the offender report every ninety days in person.  The level of state supervision, however, has not changed in a material way

42

because the State still maintains and distributes the same amount of highly personal information about the offender.

[¶89] The effect of the registration and reporting requirements of SORNA of 1999 is substantially more burdensome than renewing a driver's license. Most notably, if the offender fails to comply with the reporting provisions in SORNA of 1999, he exposes himself to criminal liability, which reflects the punitive effect of the statute. *See* 34-A M.R.S. § 11227(1) (2012) (providing that the first offense is a Class D crime). In comparison, if an individual chooses not to renew his driver's license he is simply not permitted to drive. Although the changes to SORNA of 1999 have reduced the physical burdens on the offender, the State's supervision and control over the offender have not been reduced. This supervision and control, as we recognized in *Letalien*, signifies the punitive effect of SORNA of 1999.

B. Historically Regarded as Punishment

[¶90] Labeling a law's burden as civil instead of criminal does not reduce the level of punishment attached to the burden, nor should it reduce the constitutional protection connected to the burden.[15] Likewise, a burden that was imposed as part of a sentence does not become less punitive if it is later imposed as part of a regulatory requirement that parallels sentencing.

---

[15] The issue of whether a burden is civil or criminal was discussed in further detail in *State v. Letalien*, 2009 ME 130, ¶¶ 73-74, 985 A.2d 4 (Silver, J., concurring).

[¶91]  In *Letalien*, we provided a detailed description of the evolution of the sex offender registry in Maine.  2009 ME 130, ¶¶ 4-12, 985 A.2d 4.  One aspect of the registry that has evolved is its relation to sentencing procedures.  Beginning in 1996, the registration requirements of SORNA of 1995 were imposed as part of a sentence.  P.L. 1995, ch. 680, § 4.  Subsequently, the statute was amended to instruct the court to order convicted offenders to register at the time it imposed a sentence, but it was no longer "part of a sentence."  P.L. 2003, ch. 711, § B-13.  Although the statutory language removed the registry from the direct realm of sentencing, this change "did not, in itself, make the registration requirements less punitive or otherwise remove the constitutional infirmity."  *Letalien*, 2009 ME 130, ¶ 74, 985 A.2d 4 (Silver, J., concurring).

[¶92]  The stigma associated with publication on the Internet is demonstrative of SORNA of 1999's role as punishment and its punitive effects.  *See Smith v. Doe*, 538 U.S. 84, 115-16 (2003) (Ginsburg, J., dissenting) (noting that the public notification regimen of the registry "calls to mind shaming punishments once used to mark an offender as someone to be shunned"); *Doe v. State*, 189 P.3d 999, 1012 & n.98 (Alaska 2008) (noting that the act of registering is not analogous to shaming, but the dissemination provision is analogous).  The public does not have access to the pictures, home addresses, and work places of those convicted of robbery, arson, embezzlement, or any other crime.  We

acknowledge that there is a stigma connected to any criminal behavior and there often is retribution by the public against those who have committed crimes. However, in no other area of the criminal law do we allow the public to have access to such personal information. Because these Does have not committed additional sex crimes since they completed their sentences, they were not required to be on a registry when the registry system was first created. Placing them on the registry now forces them to face additional public ridicule. *See* Human Rights Watch, *No Easy Answers: Sex Offender Laws in the US* 78-79 (2007), *available at* http://www.hrw.org/reports/2007/us0907/us0907web.pdf (discussing the serious impact the dissemination of registration information has on the registrants).

[¶93] In *State v. Freeman* we found that the civil proceeding by which some OUI laws were enforced had punitive consequences of the type that characterize criminal prosecution. 487 A.2d 1175, 1176-77 (Me. 1985) (finding the statute void because its purpose was frustrated). In our analysis of the civil OUI proceeding, we considered, in part, the effect that the pre-charging mechanism for OUI defendants had on one's reputation. *Id.* at 1178.[16] In this consideration, we noted that the stigma from the pre-charging mechanism associated with the civil

---

[16] In *State v. Freeman*, in addition to stigma, we also considered that the defendant is still subject to arrest and detention and the "civil" charge enhances the charge and sentence of subsequent OUI violations. 487 A.2d 1175, 1178-79 (Me. 1985).

proceeding for the OUI offense paralleled the stigma associated with the criminal proceeding. *Id.* As a result, we found that the stigma was "highly suggestive of the true criminal nature of the procedure." *Id.; see also State v. Anton*, 463 A.2d 703, 708 (Me. 1983) (noting the lack of criminal stigma regarding the decriminalization of traffic offenses).

[¶94] Sex offenders who are required to register are subjected to stigma in part due to the underlying offense, but also in part due to the dissemination of information. The registry makes significant personal information readily available to the public.[17] The impact of this dissemination is heightened by the use of the Internet, thus correlating the dissemination "to the shaming and branding punishments used in colonial times." *Doe v. Dist. Attorney*, 2007 ME 139, ¶ 55, 932 A.2d 552 (Alexander and Silver, JJ., concurring). As discussed below in relation to the traditional aims of punishment, the stigma associated with Internet publication has the potential to cause "retributive and vigilante violence against registrants." *Id.* The historic connection to criminal sentencing and shaming,

---

[17] SORNA of 1999 provides the public access to each offender's name, date of birth, photograph, city or town of domicile and residence, address of employment, address of college or school, the statutory citation and name of the offense for which the registrant was convicted, and designation as a 10-year or lifetime registrant. 34-A M.R.S. § 11221(9)(A) (2012). Additional information, including the mailing address and physical location of a registrant's domicile and residence, is easily available to the public through a written request. 34-A M.R.S. § 11221(9)(B) (2012).

46

along with the retribution and deterrence discussed below, demonstrate SORNA of 1999's punitive effect.

C.     Traditional Aims of Punishment

[¶95]  SORNA of 1999 promotes retribution and deterrence, especially as it relates to Does III, X, XIX, XXIII, and XLIII.  Such characteristics are present regardless of the intent of the Legislature.  As the Indiana Supreme Court said in its discussion of that state's sex offender registration act:

> It is true that to some extent the deterrent effect of the registration and notification provisions of the Act is merely incidental to its regulatory function.  And we have no reason to believe the Legislature passed the Act for purposes of retribution—vengeance for its own sake.  Nonetheless it strains credulity to suppose that the Act's deterrent effect is not substantial, or that the Act does not promote community condemnation of the offender, both of which are included in the traditional aims of punishment.

*Wallace v. State,* 905 N.E.2d 371, 382 (Ind. 2009) (quotation marks and citations omitted).  Although we accept that SORNA of 1999 is not *intended* as retribution for sex offenders' crimes, it has that effect, due, in part, to its tendency to stigmatize the registrant.  As a result, "[i]t promotes community condemnation in its most extreme form: vigilantism." *Letalien*, 2009 ME 130, ¶ 75, 985 A.2d 4 (Silver, J., concurring).

[¶96]  As discussed in prior SORNA cases, and cited with concern by the Does in this case, acts of violence against those registered on the Maine Sex

Offender Registry are not unknown. In 2006, "a Canadian man targeted and murdered two Maine sex offenders, who[m] he had located on Maine's registry website." *Doe*, 2007 ME 139, ¶ 56 n.21, 932 A.2d 552 (Alexander and Silver, JJ., concurring); *see also Letalien*, 2009 ME 130, ¶ 75, 985 A.2d 4 (Silver, J., concurring). More recent iterations of SORNA continue to invite the possibility of vigilantism by providing access to the registry via Maine's registry website. The use of the Internet registries allows anyone, anywhere in the world, to have unlimited access to the information.

[¶97] In addition to exposing the offenders to acts of vigilantism, there is evidence that registries do not achieve their primary objective of protecting the public. *See* 34-A M.R.S. § 11201 (2012) ("The purpose of this chapter is to protect the public from potentially dangerous registrants and offenders by enhancing access to information concerning those registrants and offenders."). *See also* Kristen M. Zgoba & Karen Bachar, National Institute of Justice, *Sex Offender Registration and Notification: Limited Effect in New Jersey* 2 (2009), *available at* https://www.ncjrs.gov/pdffiles1/nij/225402.pdf (finding that the sex offender registry did not reduce the number of rearrests for sex offenses or the number of victims of sexual offenses). Instead, the registry may promote criminally deviant behavior by socially isolating offenders. *See* J.J. Prescott, *Do Sex Offender Registries Make us Less Safe?*, Regulation, Summer 2012, at 50 (discussing the

"negative collateral consequences" for registrants, including loss of social ties, that may cause an increase in criminal behavior). As Justice Brennan noted in *Trop v. Dulles*, "I can think of no more certain way in which to make a man in whom, perhaps, rest the seeds of serious antisocial behavior more likely to pursue further a career of unlawful activity than to place on him the stigma of the derelict, uncertain of many of his basic rights." 356 U.S. 86, 111 (1958) (Brennan, J., concurring). SORNA of 1999 clearly promotes retribution and deterrence by inadvertently creating an environment where the Does are stigmatized in a way that may invite violent attacks and stall rehabilitation.

D. Excessiveness

[¶98] SORNA of 1999 requires defendants convicted of statutorily specified sex offenses to register. 34-A M.R.S. § 11203(5)-(8) (2012). The registry widely disseminates information about all sex offenders convicted of these crimes. The only information provided to the public upon which it can determine the potential risk each offender poses, however, is the statutory citation and name of the offense that placed the offender on the registry. The registry, and therefore the public, does not take other factors into account, such as distinguishing between individuals "who have been evaluated by a clinical and forensic psychologist and determined to be at the lowest risk of reoffending, and those individuals who committed multiple crimes; victimized infants and toddlers; and tortured, maimed, or killed

their victims." *Letalien*, 2009 ME 130, ¶ 77, 985 A.2d 4 (Silver, J., concurring). By failing to distinguish among offenders, the registry exceeds its purpose of promoting public safety, making its effects on registrants punitive.

E.      Evaluation of the *Mendoza-Martinez* Factors

[¶99]  We do not determine whether a statute has a punitive effect based on the mere number of factors that demonstrate such effect.  Instead, we assess these factors and their relative weight.  *See Doe v. State*, 189 P.3d at 1018.  The factors discussed here, as well as the majority's discussion regarding whether the behavior is already a crime, demonstrate that SORNA of 1999 has a punitive effect.  Most notably, SORNA of 1999 imposes requirements that are historically regarded as punishment because of their connections to sentencing and the associated stigma. Additionally, the stigma associated with the registry subjects the offenders to retribution, which in turn promotes deterrence, which are traditional aims of punishment.  Overall, these factors provide clear proof that the statute's punitive effect overcomes the Legislature's civil intent.  *See Smith*, 538 U.S. at 92 (setting forth the United States constitutional standard for determining criminality of sex offenders registry).

## II.  MAINE CONSTITUTION

[¶100]   SORNA of 1999, as it applies to the Does, violates the Maine Constitution.  The Maine Constitution provides an independent basis for decision,

while the United States Constitution merely prescribes the minimum constitutional protections that states must afford their citizens.[18] We conclude that the Maine Constitution can be distinguished from the United States Constitution, and that SORNA of 1999 violates the Maine Constitution, even if it would pass muster under the United States Constitution. *Compare Smith,* 538 U.S. at 105-06 (finding the Alaska sex offender's registry constitutional pursuant to the United States Constitution) *with Doe v. Alaska,* 189 P.3d at 1003, 1007, 1019 (finding the Alaska sex offender's registry unconstitutional pursuant to the state constitution).

[¶101] The placement of the Ex Post Facto Clause within the Maine Constitution, as compared to its placement in the United States Constitution, provides us a basis for applying a more heightened standard. In the Maine Constitution, the Ex Post Facto Clause is located in article I, section 11, which declares the personal rights of Maine's citizens, while the federal Ex Post Facto Clause is located in article I, section 9, which describes the powers and limitations of the legislative branch of the federal government. *Compare* Me. Const. art. I, § 11 *with* U.S. Const. art. I, § 9, cl. 3. The placement of the clause in the Maine Constitution shows that the Maine Constitution establishes a right of the people to not be subject to ex post facto laws, unlike the clause's placement in the United

---

[18] A more in-depth ex post facto analysis pursuant to the Maine Constitution, rather than the United States Constitution, is provided in *Letalien*, 2009 ME 130, ¶¶ 66-72, 985 A.2d 4 (Silver, J., concurring).

States Constitution, which merely prohibits Congress from enacting an ex post facto law as part of a list of limitations on the powers of Congress. The distinction leads to a significant consequence: to obtain a declaration that SORNA of 1999 is in violation of the prohibition on ex post facto laws in the Maine Constitution, the Does need to merely overcome the presumption of constitutionality; under the United States Constitution, they have to show the "clearest proof" that the statute is punitive despite the legislative intent to make it civil. *See Smith*, 538 U.S. at 92.

[¶102] Here, the State argues that SORNA of 1999 is presumed to have a civil effect, and thus be constitutional. Our opinion in *Freeman* emphasizes that a statute such as SORNA of 1999, originally enacted as an explicitly criminal punishment, cannot change its criminal nature and its punitive purpose simply by changing its label and its citation. Further, as the prior discussion of the *Mendoza-Martinez* factors demonstrates, the statute's punitive characteristics rebut any presumption that the SORNA of 1999 law is somehow civil and non-punitive and thus compliant with the Maine Constitution's prohibition on ex post facto laws. SORNA of 1999 exposes the registrants to a level of supervision, stigma, and penalty that is not contemplated by civil statutes. Similarly, it promotes the traditional aims of punishment by exposing the registrants to the same penalties as those newly convicted. Whether these factors provide the "clearest proof" that the

effect of the statute is punitive is immaterial to the analysis under the Maine Constitution. These factors show that there is no doubt that SORNA of 1999 has a punitive effect that successfully rebuts the presumption of constitutionality and makes SORNA of 1999 a criminal law.

[¶103] For all the foregoing reasons, SORNA of 1999 is a retroactive application of a criminal law, which punishes those who have paid their penalty to society. Thus, it violates the Maine and United States Constitutions. Accordingly, we would vacate the judgment of the Superior Court and remand for a declaration that the requirements of SORNA of 1999 cannot be imposed, retroactively, on the plaintiffs bringing this appeal.

---

**On the briefs:**

> James E. Mitchell, Esq., and Elizabeth H. Mitchell, Esq., Jim Mitchell and Jed Davis, P.A., Augusta, for appellants John Does I, III, IV, V, VI, VII, VIII, X, XIII, XVI, XVIII, XXIV, and XLIII
>
> Ronald W. Bourget, Esq., Law Offices of Ronald Bourget, Augusta, for appellants John Does XIX and XXIII
>
> William J. Schneider, Attorney General, Paul Stern, Dep. Atty. Gen., Laura Yustak Smith, Asst. Atty. Gen., and Ronald Lupton, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

James E. Mitchell, Esq., for appellants John Does I, III, IV, V, VI, VII, VIII, X, XIII, XVI, XVIII, XIX, XXIII, XXIV, and XLIII

Paul Stern, Dep. Atty. Gen., for appellee State of Maine

Kennebec County Superior Court docket number CV-2006-113
FOR CLERK REFERENCE ONLY