MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:       2014 ME 42
Docket:         Pen-13-225
Argued:         January 15, 2014
Decided:        March 11, 2014

Panel:          SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR,
                JJ.

CLIFFORD LIPPITT

v.

BOARD OF CERTIFICATION FOR GEOLOGISTS AND SOIL SCIENTISTS

GORMAN, J.

[¶1]    Clifford Lippitt appeals from a judgment of the Superior Court (Penobscot County, *A. Murray, J.*) affirming a decision by the Board of Certification for Geologists and Soil Scientists, which concluded that Lippitt had provided a professional opinion "without being as thoroughly informed as might be reasonably expected," in violation of the Code of Ethics applicable to geologists and soil scientists.  *See* 6 C.M.R. 02 070 003-3 § 2(D) (1998).  Lippitt argues that the Board violated his procedural due process rights because there is insufficient evidence in the record to define the professional standard that he was alleged to have violated.  Additionally, Lippitt argues that the Board abused its discretion in concluding that he violated section 2(D) and that the Board's determination is

inconsistent with its findings that Lippitt did not breach other provisions of the Code of Ethics. We vacate the court's judgment affirming the Board's decision.

## I. BACKGROUND

[¶2] The evidence in the record, viewed in the light most favorable to the Board's decision, supports the following facts. *See Comm'l Union Ins. Co. v. Workers' Comp. Bd.*, 1997 ME 227, ¶ 2, 704 A.2d 358. Lippitt is a certified geologist employed at S.W. Cole, Inc. *See* 32 M.R.S. § 4902(2) (2013) (defining "[c]ertified geologist"). Some years before Lippitt joined the company in 2003, Worcester Associates had retained S.W. Cole to provide it with the technical assistance necessary to complete the closure of a landfill it owns in Southwest Harbor. That process requires the owners of landfills to coordinate their efforts with the Maine Department of Environmental Protection (MDEP) in accordance with landfill closure standards. *See generally* 38 M.R.S. § 1310-E-1 (2013); 2 C.M.R. 06 096 401-21 to -30 §§ 5-6 (2011) (providing procedures for the closure of landfills).

[¶3] Before Lippitt joined the S.W. Cole team that was working on the closure, Richard Behr, an MDEP employee and certified geologist, had visited the landfill site and conducted water quality tests of the neighboring residential wells. Based on the data that he collected from those wells, Behr concluded in 2002 that some compounds were leaching from the landfill into the neighboring wells. As a

result of Behr's conclusion, the MDEP installed water treatment systems on the affected wells.

[¶4] In May of 2004, Lippitt submitted a report to the MDEP containing tables of data indicating that the wells near the landfill showed sodium, manganese, and iron at concentrations higher than drinking water standards allowed and also showed the presence of volatile organic compounds. With regard to the organic compounds, Lippitt concluded that none of the levels found exceeded federal drinking water standards or state guidelines. In addition, Lippitt contradicted Behr's conclusion about the source of the organic compounds, stating, "There is no conclusive evidence to link elevated compound levels detected in the [tested wells] with the landfill." Lippitt concluded his report by stating,

> It is our opinion that the water quality analyses of the residential wells to date do not indicate impact from the landfill on the bedrock aquifer at the wells. Additional wells proposed at the margin of the former landfill by MDEP are not warranted. Evidence from the recent groundwater sampling supports the model that bedrock groundwater flow does not impact the residential wells along the tributary to Marshall Brook. Further, previous investigations of groundwater flow support this data.

Based on his conclusions, Lippitt recommended no further action at that portion of the landfill.

[¶5] On January 10, 2005, Behr wrote two memoranda concerning the 2004 Lippitt report to his supervisor at MDEP, Karen Knuuti. In one he wrote, "My

evaluation clearly demonstrates that at least two homes along the [neighboring] [r]oad have been impacted by contaminants leached from the Worcester Associates landfill." In the other, he wrote, "The residential water quality data indicate[] that landfill derived contaminants have impacted both the [neighboring residences'] water supplies." Based on his conclusions, Behr recommended that additional hydrogeological investigations be undertaken "to properly evaluate the magnitude and extent of contaminants caused by the Worcester Associates Landfill."

[¶6] Over the course of the next few months, Behr, Knuuti, and Lippitt agreed that S.W. Cole would drill additional bedrock wells and conduct additional testing at locations selected by MDEP. Thereafter, S.W. Cole arranged to have the wells drilled and collected data from them to comply with MDEP's requests.

[¶7] On February 22, 2006, Lippitt submitted a 338-page report presenting the results of the additional tests "in anticipation of development of a landfill closure program." In his January 17, 2008, review of Lippitt's 2006 report, Behr opined to Knuuti that Lippitt's "interpretations and conclusions are fundamentally flawed and are not supported by the data." In addition to expressing this opinion to his supervisor, Behr filed a disciplinary complaint against Lippitt with the Board of Certification for Geologists and Soil Scientists. *See* 10 M.R.S. §§ 8001(38)(O), 8003(5-A)(A)(2) (2013) (setting out the Board's authority to conduct disciplinary proceedings and impose sanctions on a licensee).

[¶8]  The Board held a contested hearing on June 8 and 9, 2010, in which it received testimony from Lippitt; Behr; Knuuti; and the Board's own expert, Andrew Reeve, Ph.D., an associate professor of hydrology and environmental geology at the University of Maine.  Two features of Lippitt's 338-page report were the subject of the disciplinary proceeding—(1) Lippitt's conclusion that S.W. Cole "found no evidence that the landfill is impacting the [neighboring] residential wells," and (2) an arrow that Lippitt drew on a map, indicating that the groundwater beneath the landfill did not flow toward the residential wells.  With regard to Lippitt's conclusion that the wells were not impacted by the landfill, Behr testified that he was concerned with Lippitt's interpretation of the data available and Lippitt's "lack of . . . understanding of the importance of characterizing the groundwater quality immediately adjacent to the landfill and sampling the homes." Similarly, Dr. Reeve testified that he "believe[d] it is unreasonable to indicate there is no evidence that the landfill is responsible for the . . . compounds in the [residential] well[s]."

[¶9]  With respect to Lippitt's map of the groundwater flow, Dr. Reeve testified that there were only two data points and that those points supported two possible conclusions: either the water moved from the wells toward the landfill, as Lippitt had indicated, or it moved from the landfill directly into the wells.

[¶10]   Lippitt testified that he believed that the landfill closure process would continue after he issued his 2006 report, and that he expected the MDEP to challenge his conclusions and request additional testing, which he viewed as an ordinary part of the landfill closure process.   He explained that he intended his report to express that, even if some compounds had leached from the landfill into the neighboring wells, there was no need to extend the investigation or delay the closure of the landfill because the levels of the compounds found were below the minimum levels provided in environmental regulations, and because he understood that those regulations governed landfill closure.   *See generally* 22 M.R.S. § 2611 (2013); 38 M.R.S. § 1310-C(4)(H) (2013) (defining water "[c]ontamination" in part as exceeding the levels in federal and state drinking water standards); 2 C.M.R. 06 096 400-3 § 1(HH) (2011) (defining "[c]ontamination" and "[p]ollution").   In addition, Lippitt testified that he qualified his conclusion about the direction of the groundwater flow, as indicated by the questioned arrow on the map, by including a notation on the map stating that he was providing an "interpretation of conditions observed."

[¶11]   The Board issued its decision on August 12, 2010.   It found the testimony of Behr and Dr. Reeve more persuasive than the testimony of Lippitt. The Board dismissed the allegations that Lippitt had engaged in gross negligence,

incompetence, or misconduct pursuant to 32 M.R.S. § 4913(1)(B) (2006)[1] and that he made a false statement or provided false information pursuant to 6 C.M.R. 02 070 003-3 § 2(F) (1998). It concluded, however, that Lippitt had given a professional opinion "without being as thoroughly informed as might be reasonably expected, considering the purpose for which the opinion or report is requested." *See* 6 C.M.R. 02 070 003-3 § 2(D). This conclusion was based on the Board's determination that (1) Lippitt had stated that he found no evidence that the landfill impacted neighboring wells despite the report's water level, hydraulic, and chemical data, which would "reasonably support" a contrary conclusion—that the landfill was releasing organic compounds into the neighboring wells, and (2) he had included with his report potentiometric surface maps showing a flow direction that was "not reasonably supported by the data in the report."

[¶12] The Board issued Lippitt a warning, stating that "[M]DEP shared some of the blame for the apparent lack of communication between the parties," and sanctioned Lippitt $3000 for the costs of the hearing. *See* 10 M.R.S. § 8001(38)(O); 10 M.R.S. § 8003(5-A)(B) (2006)[2] (authorizing the Board to

---

[1] Title 32 M.R.S. § 4913 was repealed and replaced by P.L. 2007 ch. 402, § S-11 (effective Sept. 20, 2007) (codified at 32 M.R.S. § 4913 (2013)).

[2] Section 8003(5-A)(B) has since been amended, but not in any way that affects this appeal. *See* P.L. 2009, ch. 112, § B-4 (effective Sept. 12, 2009).

impose disciplinary sanctions including issuing a warning and imposing civil penalties).

[¶13] Lippitt sought judicial review of the Board's decision in the Superior Court. *See* 5 M.R.S. § 11001 (2013); 10 M.R.S. § 8003(5-A) (2013); M.R. Civ. P. 80C. The court concluded that the Board had failed to make prerequisite factual findings regarding the professional standard that Lippitt was alleged to have violated. The court remanded the case to the Board, instructing it to make specific findings regarding the legal standards that govern a geologist's report in the process of seeking landfill closure and the environmental standards applicable to landfill closure and residential well contamination.

[¶14] On remand, the Board determined that reference to the standards governing landfill closure and contamination of residential wells was unnecessary because "the Board's concerns were not centered on specific decisions made on those standards." Rather, the Board explained its conclusion—that Lippitt had violated section 2(D) of the Code of Ethics—as follows:

> The Board responds that its decision was based on the ethical standards governing the practice of Geology, not on [M]DEP standards for the quality of drinking water or other such standards or definitions such as the meaning of the word contaminants. The Board, in reaching its conclusion that Clifford Lippitt violated ethical standards, considered what should be a reasonable approach for a geologist under the facts of the matter which includes the geologic process of how a licensee uses available information to draw conclusions. The conclusion arrived at by Mr. Lippitt that "We found

no evidence that the landfill is impacting the residential wells," considering the information available to him, was not a reasonable one and therefore breached the ethical standard. The words "no evidence" and the conclusion of no impact result in a categorical, absolute statement without a reference to DEP standards or other standards that may have placed those words in context and resulted in a different Board decision.

Additionally, the Board concluded that Lippitt's arrow indicating a southeasterly direction of groundwater flow "was based on pure speculation," and that "the hydraulic and well head data clearly supported a flow direction only in the southwesterly direction from the landfill towards the wells."

[¶15] Lippitt again sought review in the Superior Court, challenging the Board's conclusions and arguing that the Board had violated his due process rights by failing to establish by record evidence the standard of professional competence that he was alleged to have violated. The court affirmed the Board's decision, concluding that its findings were supported by Dr. Reeve's testimony. The court also concluded that the Board did not violate Lippitt's due process rights because "the risk of erroneous deprivation of [Lippitt's] rights [to his license] . . . is low[,] and additional safeguards are unnecessary." Lippitt timely appealed. *See* 5 M.R.S. § 11008 (2013); M.R. Civ. P. 80C(m).

## II.  DISCUSSION

[¶16] "Because the Superior Court was acting in an appellate capacity, we review the decision of the Board directly." *Cobb v. Bd. of Counseling Prof'ls*

*Licensure*, 2006 ME 48, ¶ 10, 896 A.2d 271. We "review[] the Board's decision . . . for an abuse of discretion, errors of law, or findings unsupported by the evidence." *Balian v. Bd. of Licensure in Med.*, 1999 ME 8, ¶ 9, 722 A.2d 364. A party seeking to vacate the Board's decision bears the burden of persuasion on appeal, and when the facts are not in dispute, we determine whether the Board "applied the law correctly and whether it exceeded the bounds of its discretion." *Zegel v. Bd. of Soc. Worker Licensure*, 2004 ME 31, ¶ 14, 843 A.2d 18. "An abuse of discretion may be found where an appellant demonstrates that the decisionmaker exceeded the bounds of the reasonable choices available to it, considering the facts and circumstances of the particular case and the governing law." *Forest Ecology Network v. Land Use Regulation Comm'n*, 2012 ME 36, ¶ 28, 39 A.3d 74 (quotation marks omitted).

[¶17]   Although we generally defer to an agency's interpretation of an ambiguous regulation or statute that is within its area of expertise, "[w]e will reject an agency's interpretation if it is unreasonable," or if the statute or regulation "plainly compels a contrary result." *Fuhrmann v. Staples the Office Superstore E., Inc.*, 2012 ME 135, ¶ 29, 58 A.3d 1083. For example, even where there were two reasonable interpretations of a statute, we have rejected an agency's construction of a statute because "the statutory scheme as a whole and its underlying policy" compelled a different construction. *Id.* ¶¶ 26, 35. Similarly, we did not defer to an

agency's interpretation of a statute where the plain language of the statute compelled a contrary result. *Scott Paper Co. v. State Tax Assessor*, 610 A.2d 275, 277-78 (Me. 1992). "The plain meaning of a statute always controls over an inconsistent administrative interpretation." *Nat'l Indus. Constructors, Inc. v. Superintendent of Ins.*, 655 A.2d 342, 345 (Me. 1995); *see also Scott Paper Co.*, 610 A.2d at 277.

[¶18] With those standards in mind, we consider Lippitt's assertions and review the actions of the Board.

[¶19] Lippitt argues that the Board's application of its Code of Ethics exceeded the bounds of its discretion. Additionally, Lippitt contends that because the Board found that he did not issue a report containing false information, *see* 6 C.M.R. 02 070 003-3 § 2(F), or engage in gross negligence, incompetence, or misconduct, *see* 32 M.R.S. § 4913(1)(B), the Board could not have found that he issued an opinion without being as informed as might reasonably be expected in the circumstances, *see* 6 C.M.R. 02 070 003-3 § 2(D).

[¶20] Section 2(D) of the geologists' Code of Ethics provides:

A geologist or soil scientist shall not give a professional opinion or submit a report without being as thoroughly informed as might be reasonably expected, considering the purpose for which the opinion or report is requested.

6 C.M.R. 02 070 003-3 § 2(D). The Board heard substantial evidence both supporting and contradicting the two conclusions at issue in Lippitt's report. After considering all of the evidence presented, the Board concluded that Lippitt had not made a false statement and that his report did not contain false information. *See* 6 C.M.R. 02 070 003-3 § 2(F). Additionally, the Board concluded that Lippitt had not violated 32 M.R.S. § 4913(1)(B) by engaging in gross negligence, incompetence, or misconduct. Rather, the Board determined that Lippitt's conclusion regarding the impact of the landfill on neighboring wells violated section 2(D) because "it was not justified by the available data." Similarly, the Board concluded that the directional arrow included in Lippitt's report violated section 2(D) because it found credible Dr. Reeve's testimony that the data supported a flow in the opposite direction, and "[t]he Board independently arrived at the same conclusion." The Board explained that its decision addressed "how a geologist should deal with available data." In other words, the Board determined that Lippitt violated section 2(D) because it disagreed with the conclusions Lippitt reached, not because he was not "thoroughly informed." Indeed, Dr. Reeve and the Board reached their conclusions based on the information in Lippitt's report, not by relying on information that Lippitt should have, but had not, obtained.

[¶21] Although deference is owed to an administrative body's interpretation of its own ambiguous rules, *see Fuhrmann*, 2012 ME 135, ¶ 29, 58 A.3d 1083, the

ethical rule here is not ambiguous. The Board's disagreement with a geologist's opinion, without a concurrent determination that the opinion is false, is based on false data, or reflects the geologist's incompetence, cannot be the basis for a determination that the opinion constitutes a violation of section 2(D) of the geologists' Code of Ethics.

[¶22] The Code of Ethics and the statutes governing the Board's authority to impose discipline permit the Board to sanction a geologist for issuing an opinion that is the result of gross negligence, incompetence, or misconduct, *see* 10 M.R.S. § 8003(5-A)(A)(2); 32 M.R.S. § 4913(1)(B), or that contains a "false statement" or "false information," 6 C.M.R. 02 070 003-3 § 2(F). Additionally, section 2(D) mandates that geologists issue their opinions only in situations where they have enough information to do so. However, the language of section 2(D) does not allow for the determination of an ethical breach when the Board's conclusion is simply that the geologist's opinion is not "reasonable" in light of the underlying data. Because the plain language of section 2(D) compels a contrary interpretation, we conclude that the Board committed an error of law in determining that Lippitt violated that section. *See Nat'l Indus. Constructors, Inc.*, 655 A.2d at 345; *Scott Paper Co.*, 610 A.2d at 277.

The entry is:

> Judgment vacated. Remanded to the Superior Court for (1) entry of a judgment vacating the Board's order and (2) remand to the Board for entry of an order in favor of Lippitt.

---

**On the briefs:**

Timothy C. Woodcock, Esq., Eaton Peabody, Bangor, for appellant Clifford Lippitt

Janet T. Mills, Attorney General, and Robert C. Perkins, Asst. Atty. Gen., Office of Attorney General, Augusta, for appellee Board of Certification for Geologists and Soil Scientists

**At oral argument:**

Timothy C. Woodcock, Esq., for appellant Clifford Lippitt

Robert C. Perkins, Asst. Atty. Gen. for appellee Board of Certification for Geologists and Soil Scientists