STATE OF MAINE                                        SUPERIOR COURT
KENNEBEC, ss.                                         AUGUSTA
                                                      DOCKET NO. AP-16-02


DEREK EISENBERG,
        Petitioner


v.                                                    ORDER ON PETITION FOR
                                                      REVIEW OF FINAL AGENCY ACTION


MAINE REAL ESTATE
COMMISSION,
        Respondent


## I.    Posture of the Case.

This case is before this Court on Petitioner Derek Eisenberg's (hereinafter "Petitioner") Petition of Final Agency Action pursuant to Rule 80C, Maine Rules of Civil Procedure.

## II.   Factual and Procedural History.

1.      Petitioner is licensed in Maine as a designated real estate broker. (R. 12.) Respondent, the Maine Real Estate Commission (the "Commission"), is the body that regulates and licenses Maine real estate brokers. (R. 13.) The Commission requires that applicants for renewal of designated broker licenses complete 21 hours of continuing education ("CE") credits in the two years prior to renewal, including one "core course." (R. 13.)

2.      On March 1, 2013, the Commission established as its mandatory "core course" for designated brokers a course entitled, "Working With Buyers-What Have We Agreed To?" (R. 30.)

3.      On September 29, 2014, the Commission sent an email to members of its subscription email list stating that the mandatory "core course" for designated brokers with license renewal dates *on or after* April 1, 2015, was a course entitled, "Core Course for Designated Brokers – I," but that designated brokers with license renewal dates *prior to* April 1, 2015, could take *either* the new "core course" ("Core Course for Designated

Brokers – I") *or* the prior "core course" ("Working With Buyers – What Have We Agreed To?") to fulfill their "core course" requirement. (R. 37, 42-43, 86.) Eisenberg's e-mail address was on the subscription e-mail list beginning September 26, 2013. (R. 37.)

4. Also on September 29, 2014, the Commission updated the front page and continuing education page of its website to reflect the different "core course" requirements for designated brokers with license renewal dates on or after April 1, 2015 and those with license renewal dates prior to April 1, 2015. (R. 33-37.) Those updates remained on the website until April 1, 2015, when the website was updated again to remove the information regarding requirements for designated brokers with license renewal dates prior to April 1, 2015. (R. 36.)

5. On March 25, 2015, Eisenberg completed "Working With Buyers-What Have We Agreed To?" (R. 3.)

6. On June 16, 2015, Eisenberg completed an application to renew his designated broker's license. (R. 2.) On his application, Eisenberg certified that he had met all the requirements for renewal, including the completion of the required "core course." (R. 4.) Eisenberg's renewal licensed was issued thereafter, effective June 22, 2015. (R. 2.)

7. On July 8, 2015, the Commission notified Eisenberg that he was being audited for compliance with the Commission's CE requirements. (R. 2.)

8. On July 13, 2015, Eisenberg submitted to the Commission certificates for the CE courses that he had taken in the past two years. (R. 2.) These certificates confirmed that Eisenberg had exceeded the minimum 21 hours of CE credits, and that he taken "Working With Buyers – What Have We Agreed To?" but that he had not taken "Core Course for Designated Brokers – I." (R. 2.)

9. On August 5, 2015, the Commission Director issued a "staff complaint and petition for hearing" alleging that Eisenberg had violated 10 M.R.S.A. §§ 8003(5-A)(A)(4), (5); 32 M.R.S.A. §§ 13197(1), (3); and 02-039 C.M.R. ch. 370 § 10(A) by falsely certifying on his renewal application that he had met all the renewal requirements, including completion of the mandatory "core course," and requesting that the Commission fine Eisenberg $500 for the violation. (R. 13-14.)

10. On August 17, 2015, Eisenberg completed "Maine Core Course for Designated Brokers-I." (R. 37-38.)

2

11. On November 19, 2015, the Commission held an adjudicatory hearing on the issue of whether the Commission Director could show by a preponderance of the evidence that Eisenberg had violated 10 M.R.S.A. §§ 8003(5-A)(A)(4), (5); 32 M.R.S.A. §§ 13197(1), (3); and 02-039 C.M.R. ch. 370 § 10(A) "by certifying that he met all requirements for renewal of his real estate license, including completion of the applicable core course as part of his 21 hours of approved continuing education, when he had not completed the applicable core course as part of his approved continuing education." (R. 1-2.)

12. On December 17, 2015, the Commission issued its decision finding that "the violation had been proven by a preponderance of the evidence" and imposed as a sanction a fine of $800, which exceeded the Commission Director's requested sanction by $300. (R. 5.)

13. On January 19, 2016, Eisenberg filed this Petition For Review of Final Agency Action pursuant to M.R. Civ. P. 80C.

14. On August 8, 2016, pursuant to an amended scheduling order, Eisenberg filed a brief.

15. On September 12, 2016, the Commission filed an opposition to Eisenberg's brief.

16. On September 26, 2016, Eisenberg filed a reply to the Commission's opposition to his brief.

## III. Standard of Review.

17. "A party seeking to overturn an agency decision bears the burden of persuasion on appeal." *Anderson v. Me. Pub. Emples. Ret. Sys.*, 2009 ME 134, ¶ 3, 985 A.2d 501 (citations omitted). The agency's factual determinations must be sustained unless shown to be clearly erroneous. *Turner v. Sec'y of State*, 2011 ME 22, ¶ 8, 12 A.3d 1188 (*quoting Imagineering, Inc. v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me. 1991)).

> Although we generally defer to an agency's interpretation of an ambiguous regulation or statute that is within its area of expertise, we will reject an agency's interpretation if it is unreasonable, or if the statute or regulation plainly compels a contrary result. For example, even where there were two reasonable interpretations of a statute, we have rejected an agency's construction of a statute because "the statutory scheme as a whole and its

3

underlying policy" compelled a different construction. Similarly, we did not defer to an agency's interpretation of a statute where the plain language of the statute compelled a contrary result. The plain meaning of a statute always controls over an inconsistent administrative interpretation.

*Lippitt v. Bd. of Certification for Geologists & Soil Scientists*, 2014 ME 42, ¶ 17, 88 A.3d 154 (internal quotes and citations omitted).

18. Eisenberg argues that because the imposition of a fine is punitive, rather than remedial in nature, any statute or rule upon which a punitive sanction is imposed must be strictly construed. (Pet'r's Br. 10.) However, the Law Court has held that former statutes governing real estate brokers in Maine were regulatory and not penal because (1) "the manifest purpose" of the statues was "to protect the public," (2) "[e]xamination of the larger statutory scheme reveal[ed] that the legislative purpose of the sanctions set forth [therein] is regulatory and not penal, (3) the Commission was "an agency…within a department "whose function [was] to license and regulate professions and occupations," and (4) "[b]rokers [were] to be supervised by the Commission in a manner to insure that they meet standards which will promote public understanding and confidence in the business of real estate." *Me. Real Estate Com. v. Anderson*, 512 A.2d 351, 353-54 (Me. 1986). The statutes and rules governing Maine brokers have been updated since 1986, but Eisenberg makes no case that they are any more punitive and less regulatory than they were back then.

## IV. Analysis.

### A. Whether Eisenberg preserved his equal protection and statutory interpretation claims.

19. The Commission argues that Eisenberg failed to preserve for review his claims that the Commission (1) violated his right to equal protection and (2) misinterpreted the relevant rules and statues regarding the "core course" requirement. (Resp.'s Br. 8, 17.) Eisenberg counters that he raised both the equal protection issue and the statutory interpretation issue in his closing statement at the hearing. (Pet'r's Br. __.) Specifically, with regard to equal protection, Eisenberg stated in closing,

> [p]eople are not being treated equally here. A quarter of the renewals can take two courses and the other three quarters can only take one course. So I think you have a constitutional issue there with respect to equal protection and you're not treating all the people the same.

(R. 63.) With respect to statutory interpretation, Eisenberg stated in closing,

[i]n fact, the laws cited in the complaint really only say that the Commission can establish a core course, but there's been no reference to a rule about it being the core course at the time of renewal. I couldn't find any statute or rule cited anywhere in the complaint with respect to that. So I think that the complaint is deficient in charging me with what they're charging me with.

(R. 64.)

20.   During public deliberations immediately following the hearing, Commission member David Kitchen stated, "[i]n . . . his closing argument [Eisenberg] says that we apparently have an equal protection issue with the audit system. . . . And then also in the closing argument, he challenges that there is no provision in the law for changing of the core course." (R. 67.)

21.   The case law regarding preservation of issues for appellate review is fairly straightforward:

> In order to preserve an issue for appellate review, a party must timely present that issue to the original tribunal; otherwise, the issue is deemed waived. *See Ford Motor Co. v. Darling's*, 2014 ME 7, ¶ 41, 86 A.3d 35. The preservation rule ensures that the decision-making body has the opportunity to consider the issue and correct any perceived error in order to avoid having its decision vacated or remanded after an appeal. *See Wells v. Portland Yacht Club*, 2001 ME 20, ¶ 5, 771 A.2d 371; Alexander, Maine Appellate Practice § 402(a) at 242-43 (4th ed. 2013). It also ensures that any appellate review is informed by a ruling of the original tribunal. Alexander, Maine Appellate Practice § 402(a) at 242-43. "An issue is raised and preserved if there was a sufficient basis in the record to alert the court and any opposing party to the existence of that issue." *Verizon New England, Inc. v. Pub. Utils. Comm'n*, 2005 ME 16, ¶ 15, 866 A.2d 844 (quotation marks omitted).

*Brown v. Town of Starks*, 2015 ME 47, ¶ 6, 114 A.3d 1003. "[W]here the decision on appeal is that of an administrative agency, it is important for a party to raise an issue of statutory interpretation during the proceedings before that agency to give it an opportunity to consider the argument first." *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 2014 ME 56, ¶ 20, 90 A.3d 451.

22. The Commission cites both *Verizon New England, Inc.* and *Cent. Me. Power Co.* to support its proposition that Eisenberg failed to preserve the issues he raised in summation (Resp't's Br. 8-9), but the undersigned does not read those cases to do so. As Eisenberg notes, the Court in *Verizon New England v. Pub. Utils. Comm'n* held that Verizon's First Amendment argument was properly preserved when Verizon wrote in the letter that functioned as a request for review,

> when Verizon entered into the ILP Stipulation, it agreed to temporarily refrain from exercising certain of its First Amendment rights. . . . In this proceeding . . . Verizon has conclusively shown that both the toll market in general, and individual toll customers in particular, no longer need the extraordinary regulatory measure of prior restraint put in place by the Stipulation . . . . The extraordinary abridgement of Verizon Maine's free speech with respect to inbound telemarketing is plainly no longer required to protect toll competition. 2005 ME 16, ¶ 15, 866 A.2d 844. The Court held that "the contents of the letter were sufficient to make the [PUC] aware of the looming free speech issue" even though the letter itself was never entered into the official record. *Id.* The Court in *Cent. Me. Power Co.*, meanwhile, held that an issue was preserved for appeal by Central Maine Power Company ("CMP") when CMP had not raised the issue at all in the hearing, PUC raised it for the first time in its decision, CMP moved for reconsideration, and the PUC denied CMP's motion. *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 2014 ME 56, ¶ 21, 90 A.3d 451.

23. The Commission presents no case law or other evidence showing that an argument brought up for the first time in the summation of an administrative hearing is not thereby preserved. Although the Commission apparently misinterpreted Eisenberg's equal protection argument as applying to the Commission's audit system rather than its "core course" requirement, it is clear from the record that the Commission had notice of Eisenberg's arguments when it reached its decision, although admittedly the arguments might have been clearer, and consequently the undersigned finds that Petitioner raised the issues sufficiently in order for them to be preserved for appeal.

B. Whether the Commission erred by finding that Eisenberg violated 10 M.R.S.A. §§ 8003(5-A)(A)(4)-(5); 32 M.R.S.A. §§ 13197(1), (3); and 02-039 C.M.R. ch. 370 § 10(A).

24. Eisenberg argues that the Commission erred in finding that he violated 10 M.R.S.A. §§ 8003(5-A)(A)(4)-(5); 32 M.R.S.A. §§ 13197(1), (3); and 02-039 C.M.R. ch. 370 § 10(A).

25. "The...commission may deny or refuse to renew a license, may suspend or revoke a license and may impose other discipline as authorized in this subsection for...[a]ny violation of the governing law of an office, board or commission [or] [a]ny violation of the rules of an office, board or commission...." 10 M.R.S.A. §§ 8003(5-A)(A)(4)-(5) (Supp. 2015). Eisenberg argues that the Commission erred in finding that he violated 10 M.R.S.A. §§ 8003(5-A)(A)(4)-(5) because "it is not a statutory provision which is capable of being violated." (Pet'r's Br. 7.) Rather, he argues, "[i]t simply confers authority on the Commission to impose discipline." (Pet'r's Br. 7.)

26. "As a prerequisite to renewal of a license, applicants must complete 21 clock hours of continuing education within 2 years prior to the date of application in programs or courses approved by the commission. . . ." 32 M.R.S.A. § 13197(1) (Supp. 2015). Eisenberg argues that the Commission erred in finding that he violated 32 M.R.S.A. § 13197(1) because "[t]he record as a whole not only indicates that Eisenberg completed 21 hours of valid CE credits, but in fact exceeded the number of credits, submitting a total of 26 credit hours." (Pet'r's Br. 8 (citing R. 29).)

27. "The commission may establish a core educational requirement for each license type, not to exceed 6 clock hours, in which case the remaining requirement shall be fulfilled from elective programs approved by the commission." 32 M.R.S.A. § 13197(3) (Supp. 2015). Eisenberg argues that the Commission erred in finding that he violated 32 M.R.S.A. § 13197(3) because "this statutory provision vests the Commission with the authority to establish core education requirements" and so "it is not possible for Eisenberg to violate [it]." (Pet'r's Br. 8.)

28. Pursuant to 02-039 C.M.R. ch. 370 § 10(A) (1996), "no real estate license may be renewed or activated unless the licensee has completed a three hour continuing education program approved as meeting the core educational requirement." Furthermore, "[a] licensee, for purposes of renewal or reactivation, shall use only those clock hours which were accumulated during the two (2) years immediately preceding such renewal or activation." 02-039 C.M.R. ch. 370 § 7(B) (1996). "The Commission, on an annual basis, shall review the prescribed curriculum for the core educational requirement." 02-039 C.M.R. ch. 370 § 10(B) (1996).

29. Eisenberg argues that the Commission erred in finding that he violated 02-039 C.M.R. ch. 370 § 10(A) because "at the time Eisenberg renewed his license, the core course, 'Working with Buyers-What Have We Agreed To?' was an 'applicable core course,' under the Rule established by the Commission and the relevant statute." (Pet'r's Br. 9.) According to Eisenberg, because, pursuant 02-039 C.M.R. ch. 370 § 7(B) and 32 M.R.S.A. § 13197(1), CE credits earned within two years prior to a renewal count

towards that renewal, "[t]he only reasonable interpretation of the Rule and the statute lead to the conclusion that a CE credit must be honored by the Commission for a period of two years," and since "Working with Buyers-What Have We Agreed To?" was an approved "core course" for a time within the two years prior to Eisenberg's renewal, the Commission must honor it as such. (Pet'r's Br. 9-10.)

30. The Commission counters that the 21-hour minimum for total CE credits and the "core course" requirement are "two distinct...requirements." (Resp't's Br. 10.) The Commission also argues that "[t]he plain language of the statute and rule lack any provisions that would limit the Commission's ability to designate a new course or program as the core educational requirement." (Resp't's Br. 11.) Furthermore, the Commission argues that since 02-039 C.M.R. ch. 370 § 10(B) states that the Commission "shall review the prescribed curriculum for the core educational requirement" annually, "the plain language of the rule contemplates that the Commission will frequently change what course or program will satisfy the core education requirement." (Resp't's Br. 11.)

31. Eisenberg is correct that, strictly speaking, 10 M.R.S.A. §§ 8003(5-A)(A)(4)-(5) or 32 M.R.S.A. § 13197(3), merely empower the Commission and do not directly regulate licensees. However, there is no indication that the Commission's finding that Eisenberg violated those statutes was anything more than a harmless semantic error. There was clearly sufficient evidence for the Respondent to conclude Petitioner had violated the operative statutes and rules.

C. Whether the Commission violated Eisenberg's right to Due Process by failing to give him fair notice of what core course he was required to complete.

32. Eisenberg argues that the Commission's failure to give him fair notice of the change in "core course" requirement is evident because (1) the Commission did not send him notice via regular mail, (2) the Commission failed to provide documentary evidence of the contents of its website prior to November 17, 2015, and (3) the Commission had not adopted any "official interpretation" of the "core course" rule. (Pet'r's Br. 14.) Eisenberg adds that "the Commission has adopted a piecemeal schedule for implementing new core CE requirements," and that under the Commission's interpretation of its rules, "a broker could take an 'approved' core course on a Monday, renew their license on Tuesday certifying that they had taken the required core course, and find themselves being disciplined because the core course expired on Tuesday." (Pet'r's Br. 14-15 (citing R. 31, 84).) According to Eisenberg, this issue is exacerbated by the fact that the license renewal application does not identify the mandatory "core course" by title. (Pet'r's Br. 15-16 (citing R. 74-75).)

33. The Commission counters that "the record is replete with competent evidence supporting the Commission's finding that Eisenberg received adequate notice." (Resp't's Br. 16.) To wit: (1) testimony by the Commission's education coordinator Cathy Pendergast that the Commission's website was updated to reflect the new requirement on September 29, 2014 (R. 32-37); (2) the Commission's Exhibit 4, a memo dated July 20, 2015 from Ms. Pendergast to Ms. Bivens stating, *inter alia*, that the website had been updated on September 29, 2014 in the manner to which Ms. Pendergast testified (R. 84-85); (3) the Commission's Exhibit 6, a screenshot of the Commission's website taken November 17, 2015, containing contemporary information about the "core course" requirement (R. 90-91); (4) testimony by Ms. Bivens that the Commission had sent a mass email regarding the changes on September 29, 2014 (R. 37-38); and (5) the Commission's Exhibit 5, a copy of the September 29, 2014, email and screenshot from the email list administrator's page showing that Eisenberg had been on the list since September 26, 2013 (R. 86-89). (Resp't's Br. 16-17.)

34. Eisenberg's argument is based on the standard applied in *Central Maine Power Co., v. Public Utilities Comm'n*, 2014 ME 56, 90 A.3d 451:

> It is well settled law that persons engaged in activities subject to state or local regulation are entitled to know with reasonable clarity what they must do to engage in the regulated activities without violation of the law. The Court does not defer to agency interpretation when an agency takes enforcement action in a manner that deprives regulated parties of adequate notice about how to comply with the law and promotes practices that are contrary to the purpose of the law.

(Pet'r's Br. 13 (quoting *Central Maine Power Co.*, 2014 ME 56, ¶ 29, 90 A.3d 451) (internal quotation marks omitted).)

35. The Commission counters that Eisenberg "seeks to impose on the Commission a notice requirement far beyond anything required under Maine law." (Resp't's Br. 15.) According to the Commission, "*Central Maine* does not require that an agency seek out all licensees and affirmatively inform them of the requirements of their license. Rather, it merely requires that the agency make the information publicly available to the licensee." (Resp't's Br. 15 (citing *Central Maine Power Co.*, 2014 ME 56, ¶ 35, 90 A.3d 451 (Central Maine Power Co. had reasonable notice of the Public Utilities Commission's interpretation of its fund allocation regulations because it "had access to" an applicable rule amendment and a Public Utilities Commission ruling on

point, and because it "could readily observe" the effect of its improper allocation of funds).)

36. The Court finds that due process requires the Commission to provide notice *reasonably calculated* under all the circumstances to apprise interested parties of changes in the rules, and that the notice as articulated above was sufficient. Although Petitioner informed the Commission that he "possibly" might testify at the hearing below, Petitioner made the conscious decision not to do so. Petitioner could have offered testimony that he never received notice; instead, he chose to argue that the Commission "didn't know" if he in fact received e-mail notice of the change in the rules and/or "couldn't prove" that he had in fact had actual notice of the core course change. Petitioner does not prevail on this argument either.

D. Whether the Commission violated Eisenberg's Equal Protection rights.

37. Where a law does not affect a fundamental right or involve a suspect class, it "need not operate uniformly on all individuals as long as those affected are reasonably different from those excluded and there is a rational basis for treating them differently." *Brann v. State*, 424 A.2d 699, 703 (Me. 1981) (internal quotes omitted).)

> When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to assure that all persons subject to legislation or regulation are indeed being "treated alike, under like circumstances and conditions." Thus, when it appears that an individual is being singled out by the government . . . the Equal Protection Clause requires a "rational basis for the difference in treatment."

(Pet'r's Br. 19 (quoting *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 602 (2008)
(quoting *Hayes v. Missouri*, 120 U.S. 68, 71 (1887); *Willowbrook v. Olech*, 528 U.S. 562, 564
(2000))).)

38. Eisenberg admits that he is not a member of a "suspect class" but he states that he "is not required to be a member of a suspected classification to receive protection from arbitrary government action that treats him differently than other similarly situated persons." (Pet'r's Br. 21.) Eisenberg argues that he "was subject to . . . arbitrary action" because "according to the Commission he could only satisfy his core CE requirement by completing one core course, whereas other applicants could meet their requirements by completing one of two core CE courses." (Pet'r's Br. 19.)

39. The Commission counters that its "core course" policy (1) does not treat similarly situated individuals differently and (2) is rationally related to a legitimate government interest. (Resp't's Br. 20, 21.)

40. The Commission argues that designated brokers with license renewal dates prior to April 1, 2015 are not "similarly situated" to designated brokers with license renewal dates on or after April 1, 2015 because "[Equal protection principles do] not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time." (Resp't's Br. 20 (quoting *Sperry & Hutchinson Co. v. Rhodes*, 220 U.S. 502, 505 (1911) (alteration in brief)).) The Commission also cites *MacImage of Maine, LLC v. Androscoggin County*, 2012 ME 44, ¶ 34, 40 A.3d 975; *Brann v. State*, 424 A.2d 699, 703 (Me. 1981); *People v. Jones*, 1 Cal.App5th 221, 232 (Cal. Ct. App. 4th, July 7 2016); *Russo v. Shapiro*, 309 F.Supp. 385, 392 (D. Conn. 1969); and *Bean v. State*, 2008 MT 67, ¶ 17, 179 P.3d 524, all to support its argument that there is no equal protection violation "where a change in statute results in change in rights of individuals between an earlier and later time." (Resp't's Br. 20-21.)

41. Eisenberg distinguishes the cases cited by the Commission, namely *Sperry & Hutchinson Co.*, *MacImage of Maine, LLC*, and *Brann*, by arguing that they all concerned one-time rule changes, where as "here the structure of rotating CE requirements creates a never ending cycle where similarly situated individuals . . . are continuously treated differently based upon the date that they must renew their licenses" (Pet'r's Reply 4-5.) While Eisenberg is correct that none of the cases cited by the Commission specifically involve what Eisenberg calls a "never ending cycle" of rule changes, Eisenberg does not present any case that does. Eisenberg does, however, liken the Commission's policy to a hypothetical Bar policy setting different CLE requirements by attorney birthdate.

42. Still, the Commission argues, its "core course" policy is valid because it passes the "rational basis" test. (Resp't's Br. 21.) The "rational basis" test is highly deferential to the government actor. "The burden is on the party challenging the government action to demonstrate that there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals." (Resp't's Br. 21 (quoting *Doe I v. Williams*, 2013 ME 24, ¶ 54, 61 A.3d 718).) The Commission argues that it has a legitimate interest in ensuring a smooth transition between approved "core courses" and that the transition period policy is rationally related to that interest. (Resp't's Br. 21.)

43. Eisenberg counters that the Commission's policy does not ensure a smooth transition between "core courses" but rather "makes the process more confusing." (Pet'r's Reply 6.) Eisenberg adds that "while [the policy] may provide one quarter of all renewal

applicants extra flexibility in regard to course selection, that same benefit is not conveyed to all applicants" and that there is no rational basis for a system "that confers such beneficial treatment to one group of designated brokers." (Pet'r's Reply 6.)

44. The Commission apparently does not disagree with Eisenberg that if his license renewal date had been March 31, 2015, he would have had a choice of "core course," and he would not have been sanctioned for failing to comply with the Commission's rules. The Commission also does not seem to disagree that certain designated brokers will always have a choice between two "core courses" and others will not, simply because they have different renewal dates. The Commission simply likens its rotating "core course" policy to the every-changing legal landscape as a whole. Rules change, after all, and it is incumbent upon citizens to stay up-to-date with those changes and comply accordingly. Does the rotating quality of the Commission's policy set it apart somehow? Regardless, all it takes for the policy to be found valid is some "fairly conceivable set of facts" tying it to the Commission's legitimate interest in keeping designated brokers properly educated. *Doe I*, 2013 ME 24, ¶ 54, 61 A.3d 718.

45. After a careful review of the record in this matter, the undersigned is convinced there is no violation of Petitioner's equal protection rights present. The core course requirement changed, as it apparently had approximately every two years or so for the foreseeable past. As the Respondent pointed out in its brief, equal protection principles do not forbid statutes and statutory changes to have a beginning, and "thus to discriminate between the rights of an earlier and later time." *Sperry and Hutchinson Co. v. Rhodes*, 220 U.S. 502, 505 (1911), *MacImage of Maine, LLC v. Androscoggin County*, 2012 ME 44.

46. The undersigned declines to find that Petitioner was within a set of similarly situated persons who were not treated equally under the law. *Friends of Lincoln Lakes*, 2010 ME 18. Moreover, even if the Court were to find otherwise, here the Court also finds that the temporal classification based upon differing license expiration dates is rationally related to a legitimate goal that survives constitutional scrutiny. It is rational, and reasonable, to change the core course education requirement from time to time. It is also rational and reasonable to have a transition period between the "old" core course requirement and the "new" core course requirement so as to insure the process proceeds fairly and smoothly and not unreasonable burden impacted licensees.

47. It is unfortunate in the Court's mind that the sanction of Petitioner was increased by the Commission, but this does not provide grounds for relief for Petitioner. The Commission obviously found that the arguments of Petitioner to be without any merit; this Court does not hold the same belief. Regardless, the Court does not find any

abuse of discretion, error of law, or findings not supported by the evidence, and thus **affirms** the decision below.

The Clerk is directed to incorporate this Order by reference into the docket for this case, pursuant to Rule 79(a), Maine Rules of Civil Procedure.

Date: 11/28/16

BY _____

Robert E. Mullen, Deputy Chief Justice
Maine Superior Court