STATE OF MAINE
LINCOLN, SS

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-14-01

AQUAFORTIS ASSOCIATES, LLC     )
                               )
            Appellant,         )
                               )
v.                             )     **DECISION AND ORDER**
                               )
MAINE DEPARTMENT OF            )
ENVIRONMENTAL PROTECTION       )
                               )
            Respondent.        )

## INTRODUCTION

This matter is before the Court on an appeal by AquaFortis Associates, LLC, Appellant, from a Water Level Order in Matter #L-22585-36-B-N issued by the Maine Department of Environmental Protection ("DEP"), Respondent, regarding the Clary Lake Dam. This appeal has been brought in accordance with 38 M.R.S. § 346(1), 5 M.R.S. §§ 1101-1108, and M.R. Civ. P. 80C.

## FACTS

The Clary Mill was constructed as a lumber mill in Whitefield, Maine in the 1890's over what was then Pleasant Pond Brook by Henry Clary. (Certified Record "C.R." 98; 264 at 6). The Clary Mill site included the mill, a millpond, the mill dam, and other property adjacent to the brook. (C.R. 98). Henry Clary built the Clary Lake Dam ("the Dam") in 1903 and purchased some of the land under the newly formed Clary Lake ("the Lake"), created by impounded water from the Dam. (C.R. 98; 264 at 6). To the extent possible, the Dam controls the water levels of the Lake. (C.R. 106 at 123[1]; 264 at 6).

---

[1] In citations to the Certified Record, page numbers generally refer to the number of the document except for citations to C.R. 106. In citations to C.R. 106, which is a transcript of the public hearing held on Aug. 12, 2012, the page numbers refer to the transcript page numbers, not the document page numbers.

1

Around 1980, Chester Chase owned the Clary Mill site and converted the hydro-mechanical usage of the Dam into hydro-electrical by installing a generator. (C.R. 106 at 73 and 80). Around this time, he also filled the Dam's large aperture discharge outlet with a concrete plug. (C.R. 106 at 69; 264 at 6). In 1995, he partitioned the Mill site into multiple parcels which no longer operated in an integrated way, and sold the Dam to the then-president to the Clary Lake Association ("CLA"). (C.R. 108 Ex. R).

Pleasant Pond Mill ("PPM") bought the Clary Mill, milldam, and millpond, including flowage rights, in 2003. (C.R. 1; 108 Ex. R). It purchased the millhouse and the Dam in 2006, placing the entire Mill site under single ownership again. (C.R. 1; 108 Ex. R). In 2010, PPM transferred the land and flowage rights it bought in 2003 to AquaFortis. (C.R. 1; 108 Ex. R). The Dam has not been operated for either hydro-mechanical or hydro-electrical use since at least 2003. (C.R. 106 at 21, 72-73, and 105-106). The Dam currently has a narrow vertical crack in the concrete plug that was installed by Chester Chase. (See C.R. 40 at 7 and 8). However, it is still capable of impounding water and meets the statutory definition of dam. (C.R. 264 at 6).

On Jan. 3, 2012, a group of Clary Lake littoral owners ("Petitioners") filed a Petition to Set Water Levels/Minimum Flows ("the Petition") pursuant to the Water Level Act, 38 M.R.S. § 840 et seq. (See Petition at C.R. 1). The Petition contains the appropriate number of signatures to require the DEP to hold a hearing. (C.R. 1; 38 M.R.S. § 840(1)). The DEP processed the Petition and notified PPM on Feb. 8, 2012. (C.R. 5; 7; 8). The DEP later determined that AquaFortis was a party to the proceedings and granted it full party status over its objections. (C.R. 72; 84; 94; 98; 101; 102). The DEP also granted the CLA intervenor status. (C.R. 92). At this time, the DEP had recently lost one of its most experienced employees in dam-related matters and the Petition would be the DEP's first adjudicatory hearing on a water level petition. (C.R. 4; 106 at 84; 208). Ms. Beth

2

Callahan, the DEP's Project Manager, was tasked with gathering evidence related to the Dam. (C.R. 134). She exchanged multiple emails with Mr. George Fergusson, Spokesperson for the Petitioners, as well as with PPM and AquaFortis's attorney. (*See e.g.*, C.R 4-7; 29; 39-41; 46-54 and C.R. 30; 54; 56). There was also an email from Mr. Earle Townsend, another DEP employee, to PPM's manager Paul Kelley, Jr. (C.R. 108 Ex. L).

A public hearing on the Petition was held on Aug. 12, 2012 ("the Hearing"), with Ms. Heather Parent presiding as Hearing Officer. (See transcript at C.R. 106 and exhibits at C.R. 108). PPM and AquaFortis were represented by the same counsel. (C.R. 106 at 6). At the hearing, Ms. Callahan gave brief background testimony regarding the Petition and her fact-gathering. (C.R. 106 at 122-124). Mr. Dave Courtemach, an employee of the DEP's Division of Environmental Assessment, also testified as to the range of recommended water levels, and how he arrived at those figures. (C.R. 106 at 124-137). The record closed after the Hearing on that date, but would remain open for a report provided by PPM to the DEP. (C.R. 84; 106 at 110).

After the Hearing, there were communications between Mr. Fergusson and Ms. Callahan regarding a bathymetric study of the Lake. (C.R. 116). The study was conducted on Sept. 21, 2012. (C.R. 118). There is no dispute that PPM and AquaFortis were not given notice of the study until after it was conducted, that neither gave consent for the DEP to enter the property to conduct the study, and that the DEP did not have an administrative search warrant. After the study was completed and its results issued, all parties had the right to request re-opening of the record or to submit comments on the bathymetric study in lieu of cross-examination. (C.R. 146). The Petitioners and PPM provided comments, AquaFortis did not. (C.R. 170). There were no written requests by either party to re-open the record, and it was never reopened.

3

A draft Water Level Order ("WLO") was issued on Dec. 19, 2013, on which PPM and the Petitioners commented. (C.R. 227; 251; 253; 264 at 3). The final WLO was issued on Jan. 27, 2014. (See WLO at C.R. 264). It set forth the evidence presented, made findings according to criteria for evidence found in 38 M.R.S. § 840(4), and set Special Conditions with which the dam owner was required to comply. (C.R. 264).

Special Condition 3 requires the dam owner to repair or modify the Dam to an operational state such that it is capable of complying with the WLO. (C.R. 264 at 12). Special Condition 4 requires the dam owner to hire a professional land surveyor to determine the historical normal high water line using certain criteria and parameters and submit a surveyed plan for DEP approval. (C.R. 264 at 13). Special Condition 5 requires the dam owner to submit a water level management plan setting out the Dam's policies and procedures. (C.R. 264 at 13). Special Condition 6 requires the dam owner to permanently mount a gauge on the Dam to measure the water levels, and hire a USGS employee or other professional to inspect it. (C.R. 264 at 14). And Special Condition 7 requires the lake to be maintained at a level within 2.0 foot fluctuation of the normal high water level as determined by the survey in Special Condition 4. (C.R. 264 at 14). The DEP ordered PPM, as the owner of the dam, to comply with these conditions. (C.R. 264 at 12). It found that AquaFortis owns the mill complex, property abutting the Dam, and a structure sitting on top of the Dam, but the DEP did not make an explicit finding of whether Aquafortis is in control of any water flowage rights. (C.R. 264 at 7). Instead, it states that if AquaFortis controls any or all of the flowage rights, it is bound by the WLO along with PPM. (C.R. 264 at 7).

AquaFortis now appeals the WLO, pursuant to M.R. Civ. P. 80C.[2]

---

[2] PPM was originally also a party to this appeal. However, it was dismissed on Jan. 25, 2016 after this Court found that it waived or abandoned its rights and lost its standing.

## STANDARD OF REVIEW

The Law Court has frequently reaffirmed the principle that judicial review of administrative agency decisions is "deferential and limited." *Passadumkeag Mountain Friends v. Bd. of Envtl. Prot.*, 2014 ME 116, ¶ 12, 102 A.3d 1181 (*quoting Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 2010 ME 18, ¶ 12, 989 A.2d 1128). The court is not permitted to overturn an agency's decision "unless it: violates the Constitution or statutes; exceeds the agency's authority; is procedurally unlawful; is arbitrary or capricious; constitutes an abuse of discretion; is affected by bias or error of law; or is unsupported by the evidence in the record." *Kroger v. Dept. of Envtl. Prot*, 2005 ME 50, ¶ 7, 870 A.2d 566. The party seeking to vacate a state agency decision has the burden of persuasion on appeal. *Anderson v. Maine Public Employees Retirement System*, 2009 ME 134, ¶ 3, 985 A.2d 501. In particular, a party seeking to overturn an agency's decision bears the burden of showing that "no competent evidence" supports it. *Stein v. Me. Crim. Justice Academy*, 2014 ME 82, ¶ 11, 95 A.3d 612.

An agency's interpretation of a statute that is administered by the agency and within its expertise is given no deference if unambiguous.[3] *Whitney v. Wal-Mart Stores, Inc.*, 2006 ME 37, ¶¶ 22-23, 895 A.2d 309. "Statutory language is considered ambiguous if it is reasonably susceptible to different interpretation." *Scamman v. Shaw's Supermarkets, Inc.*, 2017 ME 41, ¶ 14, 157 A.3d 223 (internal citation omitted). If the statute is ambiguous, the agency's interpretation is given great deference and will be upheld unless the statute plainly compels a contrary result. *Dep't of Corrections v. Pub. Utils. Comm'n*, 2009 ME 40,

---

[3] AquaFortis argues that the DEP's current staff lacks experience in administering the statutes and rules related to dams, and therefore the DEP's interpretation of statutes should be given no deference. AquaFortis does not cite any authority to support its proposition that an agency must *regularly* administer or enforce a statute to be given deference. It also does not cite any authority to support its proposition that lack of experience by the current DEP staff creates bias (argued at Section 2.C below).

¶ 8, 986 A.2d 1047; *Champlain Wind LLc v. Bd. of Envtl. Prot.*, 2015 ME 156, ¶ 16, 129 A.2d 279. An agency's interpretation of its own rules is given considerable deference and should only be set aside when the regulation compels a contrary result, or the interpretation is contrary to the governing statute. *Friends of the Boundary Mountains v. Land Use Regulation Comm'n*, 2012 ME 53, ¶ 6, 40 A.3d 947.

## DISCUSSION

AquaFortis sets forth multiple arguments in this appeal to support its assertion that the WLO should be vacated or remanded. Each is discussed in turn. AquaFortis first argues that the DEP's decision is unsupported by substantial evidence in the record. This issue appears through several of AquaFortis's other arguments, and will be discussed in those contexts.

Next, AquaFortis claims that the DEP lacks jurisdiction to issue the WLO based on (i) an exemption under 38 M.R.S. § 480-Q; (ii) an exemption pursuant to the Mill Act; (iii) AquaFortis's lack of "control" over the Dam; and (iv) the Dam's breached status. AquaFortis also argues that the DEP lacks authority to order or coerce repairs to the Dam.

Then, AquaFortis asserts that it was not provided due process in regards to the bathymetric study conducted after the Hearing; that the DEP did not fulfill its statutory obligations by issuing Special Conditions 4-7; and that there was bias in the investigation which influenced the WLO.

Lastly, AquaFortis contends that there has been an unconstitutional Taking.

1. Jurisdiction

AquaFortis argues that the DEP does not have jurisdiction to issue the WLO to it, claiming exemptions to the Water Level Act, and that the DEP acted in excess of its authority when it ordered and coerced it to repair the Dam.

6

## 1.A. DEP's Authority to Issue a WLO to AquaFortis Under Section 840

The authority to issue a water level order is found in 38 M.R.S. § 840(1), which says that the DEP shall, at the request of 25% or 50 of the littoral owners, "conduct an adjudicatory hearing for the purpose of establishing a water level regime and, if applicable, minimum flow requirements for the body of water impounded . . ." Exemptions to the Water Level Act are found in Section 840(1)(A)-(F).

### 1.A.i. Exemption under Section 480-Q

One such exemption is for a dam that is "operating with a permit setting water levels issued under the protection of natural resources laws, sections 480-A to 480-S." 38 M.R.S. § 840(1)(D). Entitled "Activities for which a permit is not required," Section 480-Q does exactly as the title suggests – the statute lists activities for which no permit is required. AquaFortis argues that an email from a DEP employee, Earle Townsend, to PPM's manager Paul Kelley, Jr., constitutes an implied permit. In the email, Mr. Townsend quoted Section 480-Q and stated that if the projects he and Mr. Kelley had previously discussed were done as previously discussed, they would meet the criteria of Section 480-Q. (C.R. 108 Ex. L)

Section 480-Q is unambiguous and its plain meaning shows that there are no permits issued under this section, since the activities listed do not require a permit. There is substantial evidence to support the DEP's finding that the email from Mr. Townsend is not an implied permit, since permits under Section 480-Q do not exist. Additionally, the email from Mr. Townsend did not "set[] water levels," as required to qualify for the exemption, regardless of whether it constitutes a permit. For these reasons, Section 480-Q is inapplicable.

7

## 1.A.ii.   *Exemption via the Mill Act (38 M.R.S. § 651 et seq.)*

The Water Level Act also exempts any dam that is "operating with a permit setting water levels issued under" several additional named statutes or "any other statute regulating the construction or operation of dams." 38 M.R.S. § 840(1)(D).   AquaFortis argues that the Mill Act (38 M.R.S. § 651 et seq.) is such a statute and the Dam is a Mill Act dam, therefore it is exempt from Water Level Act jurisdiction.

No findings were made by the DEP regarding the applicability of the Mill Act to the Dam, and therefore no discussion of the Mill Act, or its relationship to the Water Level Act has been conducted below.   Nonetheless, AquaFortis's argument is unsuccessful on its interpretation of the law, so remand for such findings is not necessary.

The Mill Act is indeed a statute that regulates the construction and operation of dams.   *See* 38 M.R.S. § 651.   However, the Mill Act mentions nothing about issuing permits.   Moreover, the Mill Act does not set water levels.[4]   Looking at the unambiguous plain meaning of the Mill Act, which neither issues permits nor sets water level, the Court cannot find that the Section 840(1)(D) exemption applies.

## 1.A.iii.   *Whether AquaFortis is "In Control" of the Dam*

The Water Level Act states that the DEP "shall" upon request or petition with requisite signatures, "conduct an adjudicatory hearing for the purpose of establishing a water level regime and, if applicable, minimum flow requirements for the body of water

---

[4] In passing, AquaFortis argues in its Reply Brief and in oral argument that the Mill Act is in "direct conflict" with the Water Level Act.   Viewed in the context within which they were asserted, these arguments appear to be in response to the DEP's assertion that the Mill Act was not specifically mentioned as an exemption when the Water Level Act was enacted, and therefore the Legislature intended it not to be an exemption. AquaFortis has never cited 38 M.R.S. § 654, which provides for regulation of water height under the Mill Act.   The Court perhaps could have been able to find that this was a direct conflict and remanded for findings on the Mill Act, but this issue was not fully developed by AquaFortis and it is thus waived. *Bayview Loan Servicing v. Bartlett,* 2014 ME 37, ¶ 15 n.5, 87 A.3d 741 (a party waives a challenge to the propriety of an order by failing to adequately develop the argument in briefing).

8

impounded." 38 M.R.S. § 840(1). After the adjudicatory hearing, the DEP "shall make written findings and issue an order to the owner, lessee or person in control of the dam establishing a water level regime for the body of water impounded by the dam and, if applicable, minimum flow requirements for the dam." 38 M.R.S. § 840(5). AquaFortis interprets these provisions as granting DEP jurisdiction over the "owner, lessee person in control of the dam," and claims that it does not fall into one of those categories. PPM is the Dam's owner and AquaFortis does not lease it, so it claims that the DEP must have found that it is "in control" of the Dam in order to exercise jurisdiction. The DEP interprets these provisions as granting it jurisdiction over "the body of water impounded," and the references to the "owner, lessee or person in control" are only for notice and enforcement purposes.

As stated above, if a statute is unambiguous, its plain meaning is followed, and if the statute is ambiguous, the DEP's interpretation will be upheld unless contrary to the language of the statute. Section 840(1) states that the DEP shall establish a water level regime for the body of water impounded. Reading the statute for its plain meaning, the DEP's interpretation that it gives it jurisdiction over the body of water impounded appears correct. Even if the statute were ambiguous, that interpretation is reasonable and not plainly contrary to the statute, and is therefore upheld.

Section 840(5), however, is ambiguous. It states that the water level order is issued to the owner, lessee, or person in control of the Dam, and that the order must establish the water level regime for the body of water impounded. This provision could mean that the DEP has jurisdiction over either the body of water impounded as the physical property over which the water level is established or against the owner, lessee, or person in control as the entity to whom it is issued. Neither is an unreasonable interpretation.

9

Given the deference placed on an agency's interpretation of the statutes it administers, and that the DEP's interpretation is not plainly contrary to the language of Sections 840(1) and 840(5), the DEP's interpretation is upheld. Since it gave notice of the WLO to PPM, the DEP complied with its interpretation of Section 840. Notice was also given to AquaForits, but nothing prohibits notice being given to more than just the "owner, lessee or person in control" of the Dam. As for enforcement, this is a separate issue that is not on appeal at this time and AquaFortis is required to commence a separate lawsuit if the DEP attempts to enforce the WLO against it. Therefore, since notice was given to PPM as the owner, lessee, or person in control of the Dam, and enforcement is not ripe for discussion, there is no need for the Court to determine if AquaFortis is the "person in control" of the Dam at this point.

### 1.A.iv. Breached Dam

The Water Level Act states that a dam owner need not comply with a water level order "when the water level fluctuation not permitted by the order was caused by . . . operating failures of the dam or any associated equipment." 38 M.R.S. § 841(2). The Dam contains a narrow vertical crack, but DEP found in the WLO that the dam is still capable of impounding water because it meets the statutory definition of a dam. AquaFortis claims the dam is "breached" and therefore there is no need to comply with WLO. The word "breach" is not used in the Water Level Act, or any other relevant portion of Title 38, yet this argument appears to be made under Section 841(2) and is analyzed as such.

This leads to the question of whether that crack could reasonably be interpreted as an "operating failure." The DEP's view is upheld if supported by substantial evidence in the record. There is substantial evidence in the record to support, and AquaFortis concedes, that the dam can impound water. The crack does not prevent impoundment,

10

but merely diminishes the impounding capacity. Therefore, the DEP could reasonably find that there was no operating failure, and that Section 841(2) does not apply.

### 1.B. DEP's Authority to Order or Coerce Repairs (Special Condition 3)

While the issue of whether the DEP can order or coerce dam repairs is moot, since the DEP has said it will not enforce Special Condition 3, this argument merits a brief discussion. *See Poe v. Ullman*, 367 U.S. 497, 508 (1961) (the State's decision not to enforce a statute deprives the matter of a controversy and "[t]he Court cannot be umpire to debates concerning harmless, empty shadows."); *Doe v. Williams*, 2013 ME 24, ¶ 14, 61 A.3d 718 ("an issue is moot when there is no real and substantial controversy").

Both parties cite *Molasses Pond* to support their perspective. *Molasses Pond Lake Assoc. v. Soil and Water Conservation Comm'n*, 534 A.2d 679 (Me. 1987). In this case, the Law Court determined that under the Water Level Act's predecessor, the Neglected Dams Act, the DEP's predecessor, the Soil & Water Conservation Commission[5], did not have the authority to order structural modifications to a dam under 12 M.R.S. § 304(4)[6]. because there was a separate enforcement mechanism provided in 12 M.R.S. § 306[7]

---

[5] The Neglected Dams Act was repealed in 1983 when the Soil and Water Conservation Commission ("SWCC") was absorbed by the DEP. 38 M.R.S. § 842 evidences this transition of power from the SWCC's regulation of dams under 12 M.R.S. § 304 to the DEP under 38 M.R.S. § 840. Parts of the Neglected Dams Act are substantially similar to the Water Level Act.

[6] Under the Neglected Dams Act, 12 M.R.S. § 304(4) stated that the SWCC's order "shall, insofar as practicable, require the maintenance of a stable water level, but shall include provision for variations in water level to permit sufficient draw down of such body of water to accommodate precipitation and runoff of surface waters and to otherwise permit seasonal and other necessary fluctuations in water level."
  This is substantially similar to the current law under the Water Level Act, 38 M.R.S. § 840(5), which states that the DEP's order "must, insofar as practical, require the maintenance of a stable water level, but must include provision for variations in water level to permit sufficient drawdown of the body to accommodate precipitation and runoff of surface waters, minimum flow requirements and to otherwise permit seasonal and other necessary fluctuations in the water level."

[7] Under the Neglected Dams Act, 12 M.R.S. § 306 was entitled "Enforcement" and stated that "The commission, a dam owner, or any littoral proprietor may commence an action to enjoin the violation of any provision of this chapter. The commission may enforce the order by any other appropriate remedy. The

11

allowing the DEP to assess fines for dams that did not comply with a water level order. *Id* at 681. Here, under statutes that are substantially similar, the DEP then also does not have the authority to order structural repairs to the Dam. However, like in *Molasses Pond*, the DEP can use fines as an "adequate enforcement mechanism" to ensure compliance with the WLO. *Id.* AquaFortis is thus correct that the DEP does not have the authority to order repairs, but it does have the ability to assess fines for non-compliance. AquaFortis argues that this is equivalent to the DEP coercing it to make repairs, although this Court does not view the situation with that connotation.

## 2. Due Process

In regards to Due Process, AquaFortis argues that the DEP improperly considered the bathymetric study in issuing the WLO. It also asserts that the DEP did not fulfil its obligation to establish a water level regime and had no authority to order Special Conditions 4-7. Lastly, AquaFortis claims bias in the DEP's decision, based largely on communications between Mr. Fergusson and Ms. Callahan.

### 2.A. The Bathymetric Survey & "Based on Evidence Solicited at the Hearing"

The Water Level Act states that the DEP shall make its findings and issue a water level order "[b]ased on the evidence solicited at the hearing." 38 M.R.S. § 840(5). AquaFortis argues that since the bathymetric study was conducted after the Hearing and not "evidence solicited at the hearing," it cannot be used as a basis for the WLO.

---

violation of any order of the commission shall be punishable by a fine of not less than $20 and not more than $100. Each day of violation shall be considered a separate offense."

This is substantially similar to the current law under the Water Level Act, 38 M.R.S. § 841(3), which is titled "Enforcement" and provides that "The commissioner or any littoral or riparian proprietor may commence an action to enjoin the violation of any provision of this subarticle. The commissioner may enforce any order issued under section 840, subsection 5 or subsection 6 by any other appropriate remedy, including, but not limited to, entering the dam premises to carry out the terms of the order. The violation of any order issued under section 840, subsection 5 or subsection 6, is punishable by a forfeiture of not less than $100 and not more than $10,000. Each day of violation is considered a separate offense."

AquaFortis asserts that its lack of opportunity for cross-examination regarding the study is also violative of its Due Process rights.

Regardless of whether the phrase "based on the evidence solicited at the hearing" means based *solely* on such evidence, there is nothing here to indicate that the DEP considered the bathymetric survey in issuing the WLO. The testimony of Mr. Courtemanch at the Hearing can be summarized as follows: DEP Rule 6 C.M.R. 96-587 describes two methods to arrive at recommended water fluctuations. The first is the "standard alteration," which is a lowering of the water level by 2.0 feet, reducing it in one-foot increments by two calendar dates. 6 C.M.R. 96-587 § 6(A). This is based on how most lakes operate and is considered reasonable. The second is an "alternative water level," which requires examining the specific characteristics of the lake to see if there's another appropriate range besides the standard alteration. 6 C.M.R. 96-587 § 7. Mr. Courtemanch stated that the "alternative water level" for the Lake was 2.7 feet. The WLO called for a 2.0 foot water fluctuation in Special Condition 7. The WLO did not specifically address the two separate one-foot lowerings by specific dates, but it is still an adoption of the 2.0 foot standard alteration, which does not depend on the site-specific conditions of the Lake. As this is an agency's interpretation of the application of its own rule, supported by substantial evidence in Mr. Courtemanch's testimony, it receives deference.

"In analyzing whether a case is moot, we examine whether there remain sufficient practical effects flowing from the resolution of the litigation to justify the application of limited judicial resources." *Doe v. Williams*, 2013 ME 24, ¶ 14, 61 A.3d 718 (quotation marks omitted). Since the DEP adopted the standard alteration, which was not site-specific, there is no evidence that the DEP considered the bathymetric survey, which is site-specific, in determining the 2.0 foot fluctuations. Therefore, the question of whether the DEP could properly consider the bathymetric survey is moot because even if the

13

Court were to determine that its consideration was improper, it would have no effect on the outcome of the WLO.

As for the lack of cross-examination regarding the study, that issue is also moot because the study was not used. But the Court acknowledges that the opportunity to comment on the study, in lieu of cross-examination at the Hearing, and the opportunity to re-open the Hearing record were both adequate substitutes. A party with a substantial interest in a proceeding has a right to a reasonable opportunity to respond. *In re Maine Clean Fuels,* 310 A.2d 736, 745-748 (Me. 1973). However, this need not include cross-examination if the party is given another way to reasonably present their objections and state their position. *Id.* Thus, the opportunity to respond in comments or by re-opening the record were methods by which AquaFortis's criticisms of the study could be addressed, so its due process rights were not violated.

### 2.B. DEP's Obligations Under § 840(5) & Special Conditions 4-7

The Water Level Act requires the DEP to "make written findings and issue an order . . . establishing a water level regime for the body of water impounded by the dam and, if applicable, minimum flow requirements for the dam." 38 M.R.S. § 840(5). AquaFortis argues that the WLO's Special Conditions 4-7 do not "establish a water level regime" therefore the DEP has not fulfilled its obligation under this provision, and additionally that these conditions are in excess of the DEP's authority.

The term "water level regime" is not defined in the statutes or in case law, so its meaning is ambiguous. The former Neglected Dams Act provision (see Section 1.B above) required the order to "establish a normal water level for the body of water impounded." 12 M.R.S. § 304(4) (repealed). Clearly the newer term, "water level regime," is broader and more general than "normal water level." The DEP interprets "establishing a water level regime" to include establishing (i) a procedure by which a professional will

14

survey the lake to determine the water level (Sp. Cond. 4), (ii) the allowable fluctuations from that water level (Sp. Cond. 7), (iii) the professional installment of a gauge by which to measure the water level (Sp. Cond. 6), and (iv) the parameters of a water management plan to be set out by the dam owner (Sp. Cond. 5). While the DEP does not specifically set the height of the water level, thus not setting the height of the fluctuations, and did not set the specifics of a water management plan, it establishes procedures by which the dam owners must do so.

Given that the phrase "establishing a water level regime" is undefined and ambiguous, it is not unreasonable and contrary to the statutory language to interpret this to allow the DEP to establish procedure by which the water levels are established and measured. Since the DEP's interpretation of an ambiguous statute which it administers is given deference as long as the statute does not compel a contrary result and this interpretation is reasonably consistent with the plain meaning of "establishing a water level regime," it is upheld.

### 2.C.  Unfairness & Bias in the Investigation and Issuance of the WLO

Agency officials are presumed to act in good faith and be unbiased. *New England Telephone & Telegraph Co. v. PUC*, 448 A.2d 272, 279 (Me. 1982). In an agency proceeding, parties have a right to an impartial presiding officer. 5 M.R.S. §§ 9062, 9063; *Sevigny v. City of Biddeford*, 344 A.2d 34, 40 (Me. 1975). While an agency's presiding officer or employee with authority to take final action cannot have *ex parte* communications with parties, other agency employees are not so prohibited. 5 M.R.S. § 9055.

The presiding officer and ultimate decision-maker was Ms. Parent. Ms. Parent did not have *ex parte* communications with either party. Ms. Callahan, who was only the Project Manager, did have *ex parte* communications with both parties. However, Ms. Callahan did not have the authority to make final decisions of fact or law, so this conduct

15

At oral argument held by this Court on Feb. 6, 2018, the DEP conceded that AquaFortis may bring forth an issue that PPM raised below, as long as specific facts required for the argument are in evidence and PPM could have properly raised it on AquaFortis's behalf. PPM may have argued there was a Taking of its property rights as the owner of the Dam. However, AquaFortis does not own the Dam. In fact, since AquaFortis and PPM do not own any property jointly, any property rights possessed by PPM over which it argued a Taking are necessarily not the same property rights possessed by AquaFortis over which it is now attempting to assert a Taking. As there is no evidence in the record of either AquaFortis or PPM arguing a Taking over AquaFortis's property rights, this issue is unpreserved for appeal.

## CONCLUSION

For the foregoing reasons, therefore, the Water Level Order in Matter #L-22585-36-B-N issued by the Maine Department of Environmental Protection dated January 27, 2014 regarding Clary Lake Dam is affirmed and the AquaFortis's Rule 80C appeal is denied.

The clerk is directed to incorporate this Order by reference in the docket in accordance with M.R. Civ. P. 79(a).

DATED: February 26, 2018

Daniel I. Billings
Justice, Maine Superior Court

17